Appellant was indicted for the first degree murder of his five year old daughter by causing her suffocation. A jury found appellant guilty of second degree murder and fixed his punishment at twenty years in the penitentiary. Appellant was properly arraigned in the presence of his attorney and interposed a plea of not guilty and not guilty by reason of insanity. The special plea of not guilty by reason of insanity was subsequently withdrawn. After sentence was imposed, appellant gave notice of appeal *Page 777 
and was determined to be indigent. Appellant has been furnished a free transcript and his trial counsel was appointed to represent him on appeal.
The evidence was conflicting and as such presented questions for the jury to resolve. McBryar v. State, Ala.Cr.App.,368 So.2d 568, cert. denied, Ala., 368 So.2d 575; May v. State, Ala.Cr.App., 335 So.2d 242; Jones v. State, 54 Ala. App. 251,307 So.2d 59.
Viewing the evidence presented by the prosecution in its most favorable light, as we are required, Bass v. State, 55 Ala. App. 88, 313 So.2d 208; Livingston v. State, 44 Ala. App. 559,216 So.2d 731, we find the evidence sufficient to prove appellant's guilt beyond any reasonable doubt. The State's evidence clearly supports the jury's verdict.
Briefly, appellant and his wife took their five year old daughter, Denise, to the emergency room of the Lawrence County Hospital at approximately 7:25 p.m. on July 8, 1979. She was declared dead on arrival. Dr. Garland C. Hall, Jr. administered emergency resuscitation measures, but to no avail.
An autopsy later revealed that Denise's death was caused by "the aspiration of the stomach contents into the lungs." Dr. Joseph Haden Embry, who performed the autopsy, testified that several mechanisms could have produced the aspiration. After ruling out epilepsy and drugs in Denise's case, Dr. Embry testified that another "common cause of aspiration is asphyxia, which may be produced either by smothering or choking or anything that cuts off air from the outside." Dr. Embry gave his opinion that Denise "was probably smothered."
Just prior to the Harvilles' leaving for the hospital, Doris Nolen, a next door neighbor, testified that she heard appellant talking in a loud voice, that "he sounded like he was angry or mad or something." Approximately a week later, appellant came to Mrs. Nolen's house to use the telephone and told her "he might of did kill Denise, but if he did, it was an accident in getting her to the hospital." Appellant also told her "that them was his children to do with as he pleased, and nobody had any say-so over the kids, because they belonged to him."
Dennis Harville, Denise's twin brother, testified that he saw "Daddy put his hand over her mouth and make her die." Dennis stated that it happened in the bedroom of their house and that he rode with his parents carrying Denise to the hospital.
Mary Davis testified that she saw the Harvilles arrive at the emergency room with Denise. Dennis told her "that they were at his granny's, and Denise had cried for water. He said that after they went home Denise still was crying. And he said that Denise cried and cried. He said, `Daddy put his hand over Denise's mouth until Denise didn't cry any more.'" Mrs. Davis further stated that she "could smell whiskey real bad" on appellant.
Mrs. Floy LouAllen also testified that she talked with Dennis at the hospital when Denise was brought in. "Dennis said that she was crying, and that him placed — him did this. (Indicating) He put his hands over her mouth. And he said that her went like this, . . . and he dropped his head to his shoulders and closed his eyes. . . . And he said that mama tried to give her a drink of water and her wouldn't take it." Mrs. LouAllen stated that the odor of alcohol was strong on appellant and that she heard him say, "Blame me, it's all my fault."
E.D. Montgomery, a cell-mate of appellant's in the Lawrence County Jail, testified appellant told him in conversation that "he killed his baby."
Robert Wingo, another cell-mate of appellant's, testified: "We never had any open conversation about it, but one night Quinton had made a statement that he placed his hand over the child's mouth to keep it from crying. . . . And he went on to say that all he did was put his hand over the child's mouth to keep it quiet." *Page 778 
Mrs. Melvie Stout testified that she overheard a conversation between appellant and his sister at the funeral home. "I was seated across from them, and Quinton came into the room and he knelt — stooped down to Earlene, and he said, `They are wanting to talk to me.' . . . `What am I going to say?' and she said, `You are going to say what you said you were going to, that you were in the yard. . . .'"
After the State rested and appellant's motion to exclude the State's evidence was overruled, appellant presented the following testimony. Fred Harville, appellant's father, testified that Denise had been complaining with a stomach ache and that he heard Denise crying before "they left out and went to the doctor." The essence of Mr. Harville's testimony was "I didn't even speak to them any more after they left out of my house there. I didn't know what got wrong with her in there." Mr. Harville stated his son "wouldn't have killed her."
Dr. Willard Irwin testified that he had treated Dennis Harville for a respiratory infection on May 12, 1979, and that he had last treated Denise Harville for a respiratory infection in February of 1975.
Appellant testified in his own behalf that, while his wife, Annette, was cooking supper for Dennis and Denise, he had stepped outside to roll up the car windows and to use the bathroom. He heard Annette holler, "Quinton, something is wrong with Denise." Appellant stated that he ran into the house and Annette had Denise in her arms. "[S]he said she couldn't get her mouth open, and so I had to take my finger and prize her mouth open." It was appellant's story that, after they failed to revive Denise, "We got in the car and took her to the hospital." Appellant denied harming his child in any way. Annette Harville's testimony was substantially similar to her husband's.
The State presented additional evidence on rebuttal, which, again, was in direct conflict with appellant's version.
Prior to the reception of any evidence, and in accordance with Ala. Code § 12-21-165 (1975), the trial court conducted a hearing on appellant's motion to suppress the testimony of five year old Dennis Harville. It is alleged by appellant that Dennis could not understand the nature of an oath and was therefore incompetent to be a witness.
Omitting a number of preliminary questions which the trial judge asked Dennis, we quote from the record:
 "THE COURT: All right. Dennis, do you know what it means to tell the truth?
THE WITNESS: Uh-huh.
THE COURT: Can you tell the truth?
THE WITNESS: Uh-huh.
THE COURT: Do you know what it means to tell a lie?
THE WITNESS: Uh-huh.
 THE COURT: Which is the best, to tell the truth or to tell a lie?
THE WITNESS: To tell the truth.
 THE COURT: Do you know what happens to little boys that don't tell the truth?
THE WITNESS: What?
 THE COURT: I am asking you; do you know what happens to you? What happens to you when you tell a story?
THE WITNESS: I am fibbing and fibbing.
THE COURT: You are fibbing?
THE WITNESS: Uh-huh.
THE COURT: What happens to you if you fib?
 THE WITNESS: I am going to have to tell the truth and not tell a lie.
THE COURT: You are going to what?
 THE WITNESS: I am going to have to tell the truth. When you tell a lie, you are going to have to start over and tell the truth.
 THE COURT: In other words, do you tell the truth all the time?
THE WITNESS: Uh-huh.
 THE COURT: Okay. Do you know what this hearing is about, Dennis?
THE WITNESS: Uh-huh.
THE COURT: What is it about?
 THE WITNESS: It's about telling the truth and not telling a lie. *Page 779 
THE COURT: About telling the truth?
THE WITNESS: Uh-huh, and not telling a lie.
THE COURT: All right. Do you always tell the truth?
THE WITNESS: Yes.
THE COURT: Okay. Have you been sick recently?
THE WITNESS: I was sick.
THE COURT: When were you sick?
 THE WITNESS: One time when I was at my house and I was with my mama and I got sick and I went to the hospital.
 THE COURT: You were up at your house and you got sick?
THE WITNESS: Uh-huh.
 THE COURT: That was before you started going to Mrs. Betty's, wasn't it?
THE WITNESS: Uh-huh.
THE COURT: All right.
 THE WITNESS: Before Richard Walker came and picked me up.
 THE COURT: Before Richard Walker came and picked you up?
THE WITNESS: Uh-huh.
THE COURT: Are you six years old now?
THE WITNESS: No, I am still five.
THE COURT: When will you be six?
THE WITNESS: When I get big I will be six years old.
 THE COURT: All right. (To Mr. Littrell) What does the record show his birthday is?
MR. LITTRELL: July the 1st, 1974.
THE COURT: So he was six July the first?
MR. LITTRELL: No, five.
THE COURT: Five?
MR. WHITE: Uh-huh.
 THE COURT: All right. I don't have any other questions concerning him. Dennis, who is your Sunday School Teacher, son?
THE WITNESS: Mr. Beaty.
THE COURT: Miss Betty?
THE WITNESS: No, Mr. Beaty at the church teaches me.
 THE COURT: All right. (To Mr. White) Do you have any other offering you want to make?
 MR. WHITE: No, except to renew our Motion to Suppress. He has shown no knowledge of God, and that God awards for the truth and avenges for falsehood. He has no comprehension of the solemnity of the oath, and simply —
 THE COURT: Okay. Dennis, do you know what it means to tell the truth?
(NO ANSWER FROM THE WITNESS)
 THE COURT: Do you know what it means to swear to tell the truth and to take an oath?
THE WITNESS: Uh-huh.
 THE COURT: What do you do when you swear to tell the truth?
 THE WITNESS: When you tell the truth you have got to tell the truth.
THE COURT: Okay. Anything else from the State?
MR. LITTRELL: I don't have any thing.
THE COURT: All right, come down.
(WITNESS LEAVES THE WITNESS STAND)
 THE COURT: Okay, I am going to overrule your Motion. I am going to allow him to testify."
This exact question has been recently answered by this court in Roberson v. State, Ala.Cr.App., 384 So.2d 864 [1980], an opinion authored by Judge Bowen. From Roberson, which also involved the competency of a five year old, we quote:
 "At common law the oath was regarded as a `summoning of divine vengeance upon false swearing, whereby when the spectators see the witness standing unharmed they know that the divine judgment has pronounced him to be a truth-teller.' 6 Wigmore, Evidence, § 1816 (Chadbourn Rev. 1976). The oath involved `a belief in a superhuman (and therefore inevitable) retribution to follow false swearing'. 6 Wigmore, § 1817. This belief is inherent in the very definition of an oath, Blackburn v. State, 71 Ala. 319, 321-322
(1882); Goolsby v. State, 17 Ala. App. 545, 546, 86 So. 137 (1920), and was required at common law *Page 780 
before a witness could testify under oath. C. Gamble, McElroy's Alabama Evidence, § 94.02 (1). Under the common law rule the lack of such religious training and instruction as `excited a hope of future reward to the good and fear of punishment to the wicked' disqualified and rendered one incompetent as a witness. Jones v. State, 145 Ala. 51, 40 So. 947
(1906).
 "`By the common law no particular form of religious belief was insisted on as the test of competency, other than that there should be a belief in an omniscient Supreme Being as the rewarder of truth and the avenger of falsehood.'
 Marshall v. State, 219 Ala. 83, 86, 121 So. 72
(1929).
* * * * * *
 "`Our Constitution, Section 3, does not seem to have been considered in connection with this principle, and we find that the state of the record in this case does not require a decision of its effect on the common-law rule.'
 "Section 3 of the Alabama Constitution of 1901 guarantees that `no preference shall be given by law to any religious sect, society, denomination, or mode of worship' and that the `capacities of any citizen shall not be in any manner affected by his religious principles'. The Alabama Supreme Court has not, in formal opinion, decided the effect of this constitutional provision upon the common law rule requiring a belief in a Supreme Being as the avenger of falsehood as the test for the competency of a witness. However, in Wright v. State, 24 Ala. App. 378, 135 So. 636 (1931), the Alabama Court of Appeals considered this very question. There, a majority of the Court (Bricken, P.J., and Rice, J., with Samford, J., dissenting) held that Section 3 of the Constitution `completely abrogates the common-law rule'. See 6 Wigmore, Evidence, § 1828 (b) (Chadbourn Rev. 1976). Consequently, testimony from an atheist must be admitted into evidence. Rodgers v. State, 42 Ala. App. 660, 177 So.2d 460, cert. denied, 278 Ala. 712, 177 So.2d 464 (1965).
 "Although dicta, this Court in Conner v. State, 52 Ala. App. 82, 87, 289 So.2d 650 (1973), cert. denied, 292 Ala. 716, 289 So.2d 656 (1974) stated:
 "`We do not think that our cases call for a religious test in contravention of the Alabama Constitution, § 3, nor of the First Amendment to the Constitution of the United States. Wright v. State, 24 Ala. App. 378, 135 So. 636 (witness was an atheist).
 "`The important enquiry is the morality of speaking truthfully. McGuff v. State, 88 Ala. 147, 7 So. 35; Wigmore, supra, §§ 495 (2) and 1828; Code 1940, T. 7, §§ 363 and 364.[1]
 "Under Wright, a witness's religious beliefs are immaterial. Consequently, we find that the trial judge did not err in failing to qualify the witness in this regard.
 "The primary burden of qualifying a witness is upon the trial judge. Defense counsel never made any request that he be permitted to cross examine the youth on his religious beliefs.
 "`Whether a child is qualified to take a witness' oath is a matter that is lodged necessarily in the discretion of the trial court because, among other things, the trial court has the opportunity of observing the manner and appearance of the child while being examined, an opportunity which the appellate court does not have.'
 C. Gamble, McElroy's Alabama Evidence, § 94.02 (3) (3rd ed. 1977). *Page 781 
 "See also Godau v. State, 179 Ala. 27, 60 So. 908
(1913). The record does not show that the witness was disqualified to testify. `(U)pon the objector to competency rests the burden to sustain it.' Birmingham Railway L. P. Co. v. Jung, 161 Ala. 461, 478, 49 So. 434, 440 (1909).
 "`The discretion of a trial judge as to the competency of a witness is of a well nigh irrevisable nature.' Trammell v. State, 53 Ala. App. 246, 247, 298 So.2d 666, 667 (1974). It is only in strong cases that the ruling of the trial court admitting the testimony of a witness should be reversed. Beason v. State, 72 Ala. 191 (1882)."
[1] "In Rogers v. State, 264 Ala. 500, 88 So.2d 685 (1965), a nine year old witness stated that he knew what it meant to tell the truth, that he was going to tell the truth, and that `little boys who tell lies — go to hell'. Although the issue we face was not presented in Rogers, the Alabama Supreme Court noted:
`The trial court properly ruled the witness sufficiently qualified. The foregoing indicated a knowledge on the part of the witness that he knew what it meant to tell the truth and knew what telling the truth was and that if he did not tell the truth, he would be punished. This suffices to satisfy the rule.Noble v. State, 253 Ala. 519, 45 So.2d 857.'"
From the record we do not think that we are authorized to say that the trial judge committed error in permitting Dennis Harville to testify. As in Hacker v. State, 31 Ala. App. 249,250, 15 So.2d 336, 337, cert. denied, 244 Ala. 649,15 So.2d 339, "(W)e are of the opinion if any doubt of the correctness of said ruling prevailed or existed, all such doubt was fully dissipated and rendered innocuous by the straightforward manner in which this child of tender years gave (his) testimony as a witness."
In Jackson v. State, 239 Ala. 38, 193 So. 417, the Supreme Court held that a four year old child was a competent witness.
There was testimony that appellant's wife had six children by a previous marriage. The six children were taken from her and her ex-husband by the Department of Pensions and Security and they were placed in foster homes.
After the death of the little girl in this case the five year old boy was taken from appellant and his wife by the Department of Pensions and Security. The mother was permitted to see this child on only one occasion. Her request to see this child on a second occasion was refused. This tells us, loud and clear, that the mother was unfit to even be around the surviving child for a few minutes much less that she was entitled to custody or visitation rights. Such is the background of this family. Only a depraved mind could have caused the death of this helpless child. The jury was extremely lenient in fixing appellant's sentence at twenty years in the penitentiary.
Appellant next contends that the trial court erred in admitting the testimony of Mary Davis and Floy LouAllen concerning the statements Dennis Harville made at the hospital. There is no merit to this contention as Dennis' statements to the above witnesses come within the "spontaneous exclamation or res gestae exception" to the hearsay evidence rule. This subject is treated comprehensively, with citation of supporting authorities, in C. Gamble, McElroy's Alabama Evidence, § 265.01 (1) (3rd ed. 1977):
 "Generally, a person's statement concerning a startling occurrence made while he is perceiving the occurrence, or soon after his perception thereof, and while he is under the stress of a nervous excitement created by such perception, is admissible as tending to prove the truth of the matter asserted. A statement of this kind is frequently referred to as a spontaneous exclamation or excited utterance and is an exception to the hearsay evidence rule.
 "The statement must be the apparently spontaneous product of that occurrence operating upon the visual, auditory, or other perceptive sense of the speaker. The declaration must be instinctive rather than deliberative. In short, it must be the reflex product of the immediate sensual impressions, unaided by retrospective mental action."
Applying the above principles of distinction to the present facts, our findings are in accord with the findings so succinctly expressed by Judge Clark writing for this court inBass v. State, Ala.Cr.App., 375 So.2d 540, 543:
 "That the occurrence was of a most startling nature is beyond question; that the witness was under the stress of nervous excitement while seeing, and immediately after seeing, such startling occurrence, is beyond reasonable doubt; the evidence indicates that the startling occurrence was still in progress; what he said, as well as what he did, was patently intuitive and not reflective . . . *Page 782 
 "The occurrence the witness said he saw would have been startling to a person of any age and probably would have produced spontaneous words and action. However, it is significant to note that the first illustration of spontaneity in Webster's Third International Dictionary is `the spontaneity of a child.'"
Indeed, it is difficult to imagine a five year old child more intelligently relating such a shocking occurrence witnessed just minutes earlier. The utterances clearly were not the product of deliberation or retrospection. There can be no question but that Dennis' statements were spontaneous exclamations.
Furthermore, it does not matter that the reported exclamations are not those of the victim or the appellant, but those of a third party. The rationale of the exception to the hearsay rule is not limited to exclamations of the appellant, the victim, or anyone else. Bass, supra.
 "The spontaneous exclamation of a by-standing observer is admissible the same as if he had been a participant in the exciting occurrence." C. Gamble, McElroy's Alabama Evidence, § 265.01 (8) (3rd ed. 1977).
We find the trial court acted well within its limits of discretion on the subject in admitting the testimony of the five year old child. Bass, supra; Jones v. State, 53 Ala. App. 690, 304 So.2d 34, cert. denied, 293 Ala. 761, 304 So.2d 38.
Since appellant did not submit any requested written charges it was not error for the trial court to fail to instruct the jury on first and second degree manslaughter as being lesser included offenses of first degree murder. Hall v. State, Ala.Cr.App., 375 So.2d 537.
Where a trial court's instruction to the jury is not as full as counsel desires, his remedy is to request written charges covering the matter omitted. Smith v. State, 262 Ala. 584,80 So.2d 307. An exception to the failure of a court to charge on a matter is not necessary where a requested written charge is refused. An exception reaches only what the court did say.Grisham v. State, 147 Ala. 1, 41 So. 997. Here, appellant's exception in no way pertained to any misstatement of the law. Thus, there is nothing for this court to review.
We have examined each issue raised in brief. In addition, we have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur. *Page 1133