Diane E. Donner was indicted by the Macon County Grand Jury for the July 4, 1980 murder of her husband, Willie M. Donner, by shooting him with a shotgun in violation of § 13A-6-2 Code of Ala. (Amended 1977). After a lengthy trial, the jury found appellant guilty of manslaughter. The trial court sentenced her to four years' imprisonment. From that conviction she now appeals.
Appellant raises no issue on appeal concerning the sufficiency of the State's evidence. Our review of the State's evidence convinces us that it presented a prima facie case of manslaughter. § 13A-6-3 Code of Ala. (Amended 1977). Wyrick v.State, Ala.Cr.App., ___ So.2d ___ [8 Div. 462 Ms. November 24, 1981]. Thus, only a brief narration of the facts is necessary.
Between 6:00 and 7:00 a.m. on July 4, 1980 appellant and her husband began to argue in front of their trailer in Tuskegee about where he had been the night before. Apparently, he had been away from home most of the night of July 3 and returned home shortly before their argument. A fight ensued outside their trailer with both being physically abusive to the other. The fight continued in the trailer after the victim had forced appellant inside. Shortly thereafter, the argument ended. Around 9:00 a.m., a noise similar to that of a shotgun discharging was heard by a neighbor. Shortly thereafter, appellant went to the nearby trailer of neighbor Yvonne Caldwell and told her to ". . . come on, I want to show you something, I want to show you what I did." (R. 166) Subsequently, appellant left the trailer, called an ambulance, and returned to the trailer. She later left with the ambulance and her husband.
Appellant made several incriminating statements to neighbors prior to the fight. Mrs. Yvonne Caldwell testified that on July 4 prior to the shooting appellant had asked her for a gun stating that ". . . I'm going to get him, I'm going to fix him he ain't going to be coming home late. . . ." (R. 164) Shortly after the shooting, appellant stated to Mrs. Caldwell,
 "What am I going to do, she said, what am I going to do. She said, I don't know what happened, then she said, she said we were tussling over the gun. First she said she didn't know what happened, then she said, we was struggling over the gun. And then she said, I'm (appellant) crazy, . . . ." (R. 167)
Mrs. Caldwell testified that about two or three hours after the ambulance had left, appellant returned and stated to her:
 "Yvonne, don't tell anybody what I told you this morning, nothing I said this morning. She said, they will try to say I did it." (R. 170) *Page 463 
Mrs. Caldwell stated that appellant's appearance and clothes were neat with no scratches or blood on her.
Mrs. Gloria Simmons, a neighbor of appellant, and her sister, Ms. Bertha Moss, testified to the July 4 fight between appellant and her husband. Simmons heard the gunshot and saw appellant go to Caldwell's trailer, leave and return to the trailer park, and talk to Caldwell again. Both testified that shortly after the shooting they heard appellant state to Caldwell, ". . . what was she going to do, she couldn't take him to the police because they would say she did it." (R. 124) Both witnesses testified that appellant's appearance was neat and saw no scratches or blood on her.
Appellant's oral statement to Macon County Deputy Sheriff James Smith, properly admitted after proof that appellant was informed of and waived her Miranda rights and the proper voluntariness predicate was established, revealed that she admitted shooting her husband while asleep on the couch.
The ambulance drivers as well as members of the hospital emergency room staff testified to their attempts to assist and save the victim's life. Both Dr. Wendell Gaylord, who treated the victim at the hospital and Dr. Thomas Gilchrist, who performed an autopsy on the victim, testified that the cause of death was a shotgun wound to the chest.
Dr. Gilchrist, whose qualifications were unchallenged, testified that the wound was not self-inflicted and that it was fired from a distance of one to three feet away. He testified that the trajectory of the shell through the body was consistent with the theory that the victim was lying down when shot and with such being fired from behind him and over his left shoulder.
Aside from the character evidence offered by appellant, she asserted that the shotgun was fired accidentally during a scuffle between them shortly after the victim had pointed it at her head and threatened to blow it off.
 I
Appellant contends that the trial court erred in denying her motion to suppress evidence seized during a search of her trailer.
During the initial search of the trailer by Tuskegee Police Officer Marvin Brooks, who was the first police officer to arrive at the scene, no evidence was seized. Officer Brooks merely searched the trailer for suspects or other victims. After finding none, he secured the scene.
The second search of appellant's trailer, conducted by Macon County Deputy Sheriff James Smith who was in charge of investigating the shooting, discovered a shotgun in a bedroom closet. In addition, he took several photographs of the living room wherein the shooting occurred.
The trial court, after holding a hearing outside the presence of the jury on appellant's motion, suppressed introduction of the shotgun into evidence. Thus, there was no adverse ruling to appellant as her motion was granted rather than denied.
Apparently, appellant considers the photographs "evidence" seized during Deputy Smith's search of the trailer and therefore inadmissible even though they do not depict the shotgun. Regardless of whether the above contention raises a viable issue for our review, appellant objected to the admission of the photographs contending that the scene had been materially altered prior to their taking as a coffee table on which the victim had fallen, was not shown.
Oscar Rowe, an emergency medical technician who responded to appellant's call for assistance, testified that he and his partner, Robert Bryant, arrived on the scene and viewed the victim in the living room of the trailer. Both men had arrived prior to and left before any police officer arrived. Rowe stated that he found the victim "laying across the coffee table with his head in a chair. . . ." (R. 93) His testimony placed the coffee table in front of the sofa on an oriental-type rug. Rowe testified that the State's photographs did not accurately depict the scene as he saw it when he arrived. The photographs were taken after both *Page 464 
men had left the scene. He stated that it was possible that he and Bryant had moved the coffee table when treating and moving the victim but, to the best of his knowledge, thought that they had not.
Robert Bryant testified that the coffee table "was right in front of the sofa" (R. 107) when he entered the living room of appellant's trailer. As far as he knew, the coffee table was in that position when he left. He unequivocally stated that he did not have to move it in order to pick up the victim.
Tuskegee Police Officer John Curwin arrived on the scene after Rowe and Bryant had taken the victim to the hospital and after Officer Brooks had initially searched the trailer. He stated, without further explanation, that the coffee table was "next to the sofa." (R. 56)
Deputy Smith, testifying as to the position of the coffee table, stated:
 "A Upon entering the living room, I saw blood on the floor, there was a chair adjacent to the right with blood on it and a couch directly in front of me with blood on it and a coffee table to my left, about a foot away from the couch.
 "Q You noticed a coffee table which was about a foot away from the couch?
"A A foot away from the couch. (R. 61)
. . . .
"Q Where's the coffee table?
 "A The coffee table would have been to the side of the couch, about a foot away.
"Q Was the coffee table turned straight?
"A It was turned straight.
"Q Was it directly in front of the sofa?
 "A No, not directly, it was just a little out." (R. 62)
. . . .
 "COURT: Was the coffee table in front of the couch or beside the couch?
 "A In front of the couch, pulled back about a foot away."
. . . .
"Q Isn't this the front of the couch?
 "A This is the front of the couch, where the blood is.
"Q But, there's no coffee table there, is there?
 "A Yes, because the coffee table wasn't important at that time, I needed the blood not the coffee table."
"COURT: Did you move the coffee table?
 "A Nothing was moved, it was just the angle I took it at.
 "COURT: Your testimony is, the coffee table was there, but the angle you took the photograph, just doesn't show the coffee table.
"A Yes sir." (R. 65)
Deputy Smith testified that the photograph fairly and accurately depicted the scene as it appeared when he arrived. He could not state whether anything had been moved prior to his arrival.
As a general rule, photographs are admissible in evidence if they are properly verified either by the photographer or a person who is familiar with the subject of the photograph and if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. Photographs may be admitted if they tend to shed light on, strengthen, or to illustrate other testimony in the case. Carpenter v. State, Ala.Cr.App.,400 So.2d 417, cert. denied, Ala., 400 So.2d 427 (1981); Hurst v.State, 397 So.2d 203, cert. denied, Ala., 397 So.2d 208 (1981); Gamble, McElroy's Alabama Evidence § 123.03 (1), (3rd ed. 1977).
It is within the trial court's discretion to determine the sufficiency of preliminary proof offered to identify photographs and to show that they fairly and accurately represent what they purport to be. Only when its exercise is abusive will such be overturned. Carpenter, supra; Hurst, supra; McElroy, § 123.03 (2).
The testimony of the State's witness leads us to believe that the coffee table had been moved at some point after the shooting. It is unclear at what point and by whom such was done. Excluding that *Page 465 
change, the testimony established the accuracy of the photographs. Further, it unequivocally proved that the photographs correctly depicted the scene at the time they weretaken.
The admission of the photographs could greatly aid the jury in better understanding the testimony of both the State's witnesses and the appellant herself as well as assist it in visualizing the spatial arrangement of appellant's living room wherein the fatal shooting occurred.
In addition, we fail to see nor has appellant explained the material significance of the position of the coffee table in reference to the struggle that ensued immediately prior to the shooting, especially in light of the fact that she does not deny her presence at that time but disputes the manner in which such occurred.
Photographs are not rendered inadmissible when conditions have changed and are not exactly the same as they were at the time when the incident occurred when the differences are immaterial and sufficiently explained to the jury. Such goes to the weight of the evidence, rather than its admissibility. Cashv. State, 43 Ala. App. 390, 191 So.2d 230, cert. denied,280 Ala. 710, 191 So.2d 234 (1966); McElroy, § 123.03 (4); See generally Stowe v. State, 53 Ala. App. 118, 298 So.2d 48 (1974);Carpenter v. State, 42 Ala. App. 618, 174 So.2d 336 (1965).
After a close scrutiny of the photographs and the testimony concerning them, we find no error in their admission into evidence.
 II
The chain of custody and possession of the corpse was clearly established through several State's witnesses. The ambulance drivers, Rowe and Bryant, testified that on July 4 they turned the victim over to the hospital emergency room staff for treatment. After an attempt to save his life, Dr. Wendell Gaylord, pronounced the victim dead.
Macon County Coroner Ocie Burton viewed the corpse on July 4 at both the hospital and morgue which was located in the hospital. He accompanied it to the morgue from the emergency room. Mr. Burton also viewed the body on July 5. At that time as the day before, the body was in the same condition as when he had received it. On July 5, he turned it over to Mr. Lonnie Hardin, an employee of the Department of Forensic Sciences.
Hardin transported the corpse to the Montgomery County morgue. He turned it over to Dr. Thomas Gilchrist who performed an autopsy on it in his presence.
Based on the above facts, we find that a sufficient chain of custody for the corpse was established for the autopsy results to have been properly admitted. Mauldin v. State, Ala.Cr.App.,402 So.2d 1106 (1981). Chain of custody evidence must show a reasonable probability that the property involved is one in the same and in the same condition. Snipes v. State, Ala.Cr.App.,364 So.2d 424 (1978); Waters v. State, Ala.Cr.App.,360 So.2d 358, cert. denied, Ala., 360 So.2d 367 (1978).
"To warrant the reception of an object in evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain." Sexton v. State, Ala.Cr.App., 346 So.2d 1177, 1180, cert. denied, Ala.,346 So.2d 1180 (1977).
Thus, we find no break in the chain of custody of the corpse.
Further, contrary to appellant's contention, the testimony of Dr. Gilchrist clearly proved the cause of death, as did the testimony of Dr. Gaylord. Their testimony was received without objection. Dr. Gilchrist testified:
 "Q Were you able to reach a conclusion as to the cause of his death?
"A Yes.
"Q What was that conclusion?
 "A Mr. Donner's death was caused by shotgun wound to the chest." (R. 13) *Page 466 
 III
Appellant stated her final contention as follows: "That the prosecution engaged in misconduct to the extent that the jury was substantially prejudiced thus depriving the appellant of a fair trial." (Appellant's brief p. 13)
Appellant directs our attention to several instances where she contends that the State asked "loaded questions" which prejudiced the jury against her. Of those instances enumerated in her brief, appellant either did not object to the questions or had her objection to it sustained. In other instances, either no answer or a negative answer was given to the question. Thus, no prejudice to appellant resulted. Davis v.State, Ala.Cr.App., 401 So.2d 187, cert. denied, Ala.,401 So.2d 190 (1981); Yates v. State, Ala.Cr.App., 390 So.2d 32
(1980); Starley v. City of Birmingham, Ala.Cr.App.,377 So.2d 1131, cert. denied, Ala., 377 So.2d 1134 (1979); Gould v. Cityof Birmingham, Ala.Cr.App., 375 So.2d 1296 (1979); Rupert v.State, Ala.Cr.App., 374 So.2d 451 (1979).
As to the State's questions referring to the victim being asleep when shot, we note that Mrs. Caldwell testified without objection that during one of her conversations with appellant on July 4 before the shooting, she said, "Roy's (the victim) asleep on the couch and I don't want to wake him up." (R. 164) In addition, in her oral statement to Deputy Smith appellant admitted that her husband was asleep when shot. On several occasions during the course of the trial, where the State attempted to elicit answers to questions concerning whether the victim was asleep, appellant's objections to such were sustained.
We find no error in any of the trial court's rulings in this regard.
We have examined the record and find same to be free of error. The judgment is therefore affirmed.
AFFIRMED.
All the Judges concur.