This is an appeal from a conviction of carnal knowledge of a girl under twelve years of age, for which the jury fixed defendant's punishment at imprisonment for ten years, the minimum provided by the applicable statute. Code of Alabama Recompiled 1958, Tit. 14, § 398.
The victim testified that defendant, her father, had had sexual relations with her at numerous times commencing when she was eight or nine years of age and continuing to a day in the first week of December, 1976, which last incident occurred when she was nearly thirteen years of age and which incident she reported to the police within a day or two after its occurrence.
The indictment followed the Code form and did not specify the time of the crime charged. The State made no effort to confine its proof to a specific time or to point out the particular separate offense for which it sought a conviction. Under these circumstances, it should be noted that if defendant's conviction stands, the principles of former jeopardy will preclude any other prosecutions of appellant under Tit. 14, § 398 as to the same girl. Eastep v. State, 25 Ala. App. 593,151 So. 616 (1933); 22 C.J.S. Criminal Law § 280. This probably explains the handling of the defendant's case and sets at naught any possible contention that he should have insisted that the State point out specifically the separate crime for which defendant was being tried.
Appellant's principal contention for a reversal is that the trial court erred in overruling defendant's motion to suppress certain evidence which defendant urges was obtained by an unreasonable search and seizure of defendant's property. It consisted of three T-shirts and a pair of corduroy pants of defendant taken by the officers from the house where defendant lived, 404 Fourth Street in Boylston, which they entered without his consent and without a search warrant.
Prior to obtaining the evidence sought to be suppressed by defendant, officers had arrested and imprisoned him on a warrant sworn to by his daughter Mary Lula, the alleged victim, who, accompanied by an older sister, reported the crime to the police. Mary Lula had been taken by juvenile authorities to the Jackson Hospital for a gynecological examination by Dr. Michael H. McCallum who testified as to physical findings indicative of a crime of the nature of that charged in the indictment. *Page 1155 
About the middle of the afternoon of December 4, 1976, officers investigating the case obtained a written consent to search the house in which defendant lived, as the tenant thereof, for clothing "that might contain some stains" and other items.[1] Consent was obtained from Julian Randy Murphy, twenty-two-year-old son of appellant, who also had been arrested and confined to jail on a warrant sworn to by Mary Lula charging him with carnal knowledge of her. Mary Lula met the officers at the house, opened the door for them and showed them the T-shirts and corduroy pants. The pants were in the "first bedroom to the right," where Mary Lula said the last crime was committed, and the T-shirts were in the back part of the house in a pile of dirty laundry.
A witness from the State Department of Toxicology and Criminal Investigation, whose qualifications as an expert were admitted by defendant, testified that upon chemical and physical analysis of the clothing, seminal fluid and sperm were detected on one of the shirts, and seminal fluid was detected on another of the shirts, but the chemical analysis of the other two items of clothing was negative though they did contain suspicious stains.
No effort was made to obtain a consent from the defendant to conduct a search; no effort was taken to obtain a search warrant.
The parties are in disagreement on the question whether the evidence on the motion to suppress shows that Randy had "common authority over or other sufficient relationship to the premises or effects sought to be inspected," declared to be a determinant as to a valid third party consent in United States v. Matlock,415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974). See also, Scott v. State, Ala.Cr.App., 337 So.2d 1342, 1346
(1976); Hawkins v. State, Ala.Cr.App., 333 So.2d 846 (1976);Myers v. State, 55 Ala. App. 404, 316 So.2d 235 (1975).
Randy took the stand on behalf of defendant on the hearing on the motion and testified that he did not live at 404 4th St. in Boylston, but that he stayed there at times and some times he stayed at other places. Other witnesses for defendant, including defendant himself, testified in a similar vein. However, there was evidence that at the time officers entered the house, recent mail was found therein addressed to Randy at that address. Furthermore, his then current automobile driver's license gave the place as his address. According to testimony of the officers, Randy told them he lived there; he gave them no other address; upon being brought to the municipal jail he signed a card showing he lived at the same address and signed his name on an envelope bearing the same address, which envelope contained his personal property turned over to the warden; at the county jail he gave the same address, which appears on his fingerprint card. Randy was at that address at or about the time of his arrest and a day or two before. In his testimony on the hearing, Randy admitted living there until he was married; at the time he had been divorced about a year.
Mary Lula had five brothers and one sister, all children of appellant and of the mother of Mary Lula, who died in 1975. Mary Lula had a half-brother, the son of appellant by a previous marriage, who had a family of his own, and there is no claim by anyone that he lived at the same place as his father.
There is a conflict in the evidence as to where the sister of Mary Lula was living in the early part of December, 1976, but she was staying with her father part of the time. The evidence is without dispute that Mary Lula, her brother fourteen years of age and another brother a few years older had been living with their father since they were born.
We find it unnecessary to make detailed comparisons, contrasts or distinctions *Page 1156 
between or among the several cases involving third party consent to a warrantless search, or the like, some of them holding the search reasonable and others holding to the contrary, for we find in none of them circumstances so similar to those presented here as to be controlling. We find little difficulty, however, in determining whether the circumstances here meet the established criterion of showing "common authority over or other sufficient relationship to the premises or effects sought to be inspected" so as to justify a warrantless search. Authorities supra. An accused is not protected by the Constitution against all warrantless searches and seizures, but only against unreasonable warrantless searches and seizures. The validity of the conduct of the officers hinges on the reasonableness vel non thereof.
As to the argument of appellant that Mary Lula was too young to have given consent to the conduct of the officers in entering the house and taking therefrom the items of clothing mentioned, reference is made to Palmore v. State, 283 Ala. 501,506, 218 So.2d 830, 834 (1969), wherein it is stated:
 "We recognize the holding in Mapp that testimony unlawfully obtained is not admissible. We do not believe, however, that an officer is making an unreasonable or unlawful search when he enters a home [the defendant's] to which he has gone in response to a phone call, and, on his arrival has been told by a child, apparently the oldest member of the family present, that her mother is in the kitchen dead. Under the circumstances of this case, we are of the opinion that his going into the kitchen was reasonable and that it would be unreasonable to require the officer to go first to a magistrate and obtain a search warrant before entering the house. Being of opinion that the testimony of the officer and toxicologist, as to the condition of the body, was not the fruit of an unreasonable or unlawful search, we hold that it was not error to admit the testimony."
The officers knew, or should have known, that they did not have to obtain the consent of every person that might have had some interest in the house and contents of the house in order to enter it lawfully in quest of demonstrative evidence of the crimes against Mary Lula charged against appellant and Randy. The first and only one of the two they asked readily gave his consent. There is no contention that they first asked Randy in a belief that he would give consent, but that appellant would not do so, and certainly there is no evidence to support any such contention.
The entry was made before dark on a Saturday afternoon. Mary Lula was in protective custody of the Montgomery County Department of Pensions and Securities by an order of the Montgomery County Circuit Court, which appointed a guardian ad litem for her, all pursuant to Acts 1975, No. 1124, § 1. According to the undisputed evidence, she volunteered to go with the officers to the house and open the house for them and show them the clothing that became the target of defendant's motion to suppress.
Guided by the light of hindsight, it may well be argued that the officers before entering the house should have either attempted to obtain the consent of the defendant or obtained a search warrant, if they thought they had time to do so, and thereby preserve the evidence they were seeking; but judging them by all the circumstances existing at the time they entered the house and found the clothing, we must hold that their conduct was not unreasonable and that the overruling of defendant's motion to suppress was not erroneous.
To eminent critics, such as Lord Macaulay,[2] of various provisions of our Constitution as to individuals' rights, on the ground that, in the absence of express governors therein against excesses, the plenary language thereof is adaptable to destructive abuse, it can be answered that such criticism *Page 1157 
cannot properly be directed at the Fourth Amendment to the Constitution of the United States. With significant uniqueness, the right safeguarded thereby, and by Art. 1, § 5 of the Constitution of Alabama of 1901, that is, the right to security of people "in their persons, houses, papers, and effects," against intrusion by agents of sovereign power, is expressly
limited to the right of security against unreasonable action in the respect stated. It has an anchor, as well as a sail; it is balanced by the built-in ballast of reasonableness.
After the hearing on the motion to suppress and a resumption of the trial before the jury, the case in some respects developed into a swearing match, replete with conflicts and impeachment. It was shown that Mary Lula had retracted her accusations a short time after her father was placed in jail. This was definitely proved by a tape recording of her retraction, which she admitted in her testimony, but she was steadfast in her testimony that her retraction was false and that her original charge against defendant was true. She was otherwise impeached by members of her family as witnesses. Some of them were impeached by witnesses who said that they had made statements contrary to their testimony. All in all, the case was one of sordid details, but which contained substantial evidence of defendant's guilt and a solid base for the jury's verdict.
Mary Nell Barnes, the twenty-year-old daughter of defendant, testified in his behalf on the trial that she, in a drunken or druggy rage, had conspired with Mary Lula to charge their father with having sex with each of them, but that such chargewas not true. On cross-examination, she was asked whether she had made statements to others that she, on numerous occasions, had had sex relations with him. This was followed by testimony of witnesses for the State in rebuttal to the effect that she had made such statements to them. Appellant takes the position that such evidence lacks the usual admissibility of generally recognized admissible testimony for impeachment purposes in showing that a witness has made statements contrary to their testimony for the reason, appellant asserts, that the testimony was not material.
The defendant first injected into the case the question whether Mary Lula Barnes had had sexual relations with her father. A party is not allowed to blow hot and cold as to the materiality of particular evidence; he cannot impliedly claim and expressly disclaim its materiality; as defendant deliberately made the question of any illegal relationship between defendant and the witness an issue in the case and presented evidence by the witness substantially favorable to defendant on the issue, defendant should be precluded from effectively contending that evidence unquestionably bearing upon the issue is not material. In Madison v. State,25 Ala. App. 50, 140 So. 623 (1932), it was said:
 "It is the law that a witness may not be impeached on immaterial matter, but, where one party has brought immaterial matter in the direct examination, the court will not be put in error for allowing the opposite party to impeach such statement."
We are not here concerned with a situation wherein the witness on direct examination testified as to facts "wholly collateral to the issue" and which "obviously could not, even if true, exert any influence upon the minds of the jury," as to which the impeachment of the witness by showing contradictory statements was held to have been improper in Blakey v. Blakey,33 Ala. 611, 622, (1859). See Gamble, McElroy's AlabamaEvidence, (3d Ed. 1977).
After Mary Lula, the complaining witness, had testified as to the crime by defendant and after she had been allowed to be impeached by defendant by showing a contradictory statement by her, the State was allowed to prove prior consistent statements by her, that is, statements consisting of complaints that defendant had had carnal knowledge with her. Appellant cites Gamble, McElroy's Alabama Evidence, § 177.01 (2), (3d Ed. 1977), where in it is stated that impeachment of a witness by the introduction of evidence of a statement *Page 1158 
inconsistent with his testimony "does not authorize the proponent of the witness to support his credibility by evidence that the witness has made a statement on another occasion of the tenor as his present testimony." However, as shown by Gamble, McElroy's Alabama Evidence, § 178.01 (3d Ed. 1977), there is an exception to the principle, to be found in "prior" consistent statements by victims of rape or other sex offenses. It is there stated:
 ". . . Where the testimony of the prosecutrix is impeached by proof of self-contradictory statements, for example, the prosecution may prove her complaints in detail."
Appellant complains of the refusal by the trial court of charges 15 and 16 as follows:
 "15. I charge you that the failure of the prosecutrix to make complaint recently after assault casts suspicion on the charge of carnal knowledge."
 "16. I charge you that the prosecutrix in this case has testified that the acts complained of occurred over a period of time and further that she made no complaint. This casts suspicion on the charge of carnal knowledge."
Appellant cites no authority in support of the contention. Aside from probable infirmities of the instructions as urged by the State, we find that Reedy v. State, 246 Ala. 363, 369,20 So.2d 528, 532, (1945), is applicable and controlling. There in dealing with two charges similar to charges 15 and 16 in instant case, the court said:
 "Charges 1 and 2 were argumentative and invaded the province of the jury in pretermitting a discretion in the jury of weighing the fact hypothesized in the charges. The two cases (Clark v. State, 28 Ala. App. 448, 186 So. 778; Stewart v. State, 25 Ala. App. 266, 145 So. 162) cited as a basis for the argument for error, while stating the proposition embraced in the charges, were dealing with matters of evidence. Abstract statements of law from judicial opinions do not always justify their correctness when embraced in charges to the jury. Southern R. Co. v. Hayes, 198 Ala. 601, 73 So. 945; Torian v. Ashford, 216 Ala. 85, 112 So. 418."
The record discloses no error prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328). His opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur.
[1] The other items, including those looked for as "instruments used in abortions," were not offered in evidence. There was no contention that they were referable to this case; they were obtained in connection with a charge that defendant had performed abortions on the mentioned older sister of Mary Lula.
[2] "Your Constitution is all sail and no anchor." Letter from Thomas Babington Macaulay (May 23, 1857) to H.S. Randall, author of a Life of Thomas Jefferson.