[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 739 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 740 
Child abuse; sentence: six years' imprisonment.
On July 11, 1982, Cecilia Melton and the victim, her five-year-old daughter Juanita, visited appellant at his residence in Montgomery. During the course of the visit, the victim was severely beaten which caused severe bruises and contusions over a large portion of her body. The child's condition was reported to the police on July 12, by Teresa Hyatt, a babysitter. She was taken into protective custody and remained therein throughout the course of the instant proceeding.
 I
Appellant first challenges the sufficiency of the State's evidence, specifically contending that he was not a "responsible person . . . who has the permanent or temporary care or custody or responsibility for the supervision of a child," under § 26-15-2 Code of Alabama 1975.
Juanita Melton testified that on July 11, her mother and she went to appellant's house where she watched television and then went into another room and fell asleep. Juanita stated that she was awakened by appellant and whipped on her face, hands, abdomen, and legs because she had fallen asleep. She stated that during her visit with appellant, he had given her a beer to drink. Later that evening at her home, Juanita exhibited her injuries to her mother. The victim testified that her mother did not inflict them.
Dr. Maurice White testified that on July 12, he examined the victim in the emergency room of St. Margaret's Hospital. He described the victim's injuries in detail as well as the treatment prescribed therefor. *Page 741 
White stated that the bruises "appeared to be at least a day old, and they were severe and generalized, and in a severe nature."
Cecilia Melton testified that she had known appellant since January, 1981. On July 11, she and the victim visited appellant at his residence. Melton stated that she and appellant were watching television while her daughter was in the living room listening to music. Melton and appellant had a couple of drinks and appellant gave the victim a beer to drink. Melton testified that she fell asleep, then awakened only long enough to go into the bedroom. She stated that she heard Juanita crying but she thought that she was dreaming. Afterwards, appellant and the victim awakened Melton and appellant told her that he had spanked Juanita "because she had lied to him about changing her panties, because I [Melton] told her not to." Melton testified that appellant told her that he had spanked the victim with a belt.
Later that evening, after Melton and the victim returned home, the child complained about her injuries and Melton observed the bruises. She did not take the victim to the hospital. The next day, Melton left her daughter with Teresa Hyatt, a babysitter. When she called Hyatt to check on her, Hyatt told her that the police had come and taken her daughter. Melton testified that she called appellant and informed him of such, at which appellant instructed her "not to tell anybody that we were seeing each other."
Melton testified as follows:
 "Q So you and Nita went over there . . . Let me ask you this. Does Robert have — in the past and around this time, has Robert had responsibility for supervising Nita?
. . . .
"A He has watched her, yes.
 "Q Okay, and he — have you ever left her with him before?
"A Yes, on several occasions.
"Q And he has had temporary care for her?
"A Yes." (R. 46-47)
Reviewing the evidence presented by the State prior to appellant's motion in the light most favorable to the State, we find that it raised questions of fact for the jury to determine as to whether the appellant was a ". . . person who has the . . . temporary care . . . of a child." The evidence, if believed by the jury, is sufficient to sustain a conviction and, thus, the denial of appellant's motion to exclude the State's evidence does not constitute error.
Appellant admitted to giving Juanita a "simple spank." A question of fact existed from the appellant's own testimony on this aspect of the case; the trial court properly denied appellant's request for the affirmative charge as well as his motion for a new trial on this ground. Gullatt v. State,409 So.2d 466 (Ala.Cr.App. 1981).
 II
Appellant contends that the trial court erred in denying his motion to suppress admission of a belt taken from him while at police headquarters.
Montgomery Police Youth Aid Division investigator F.T. Brock testified that pursuant to a complaint lodged by the victim's babysitter, he investigated this incident. After Officer Rushing brought the victim to the police station, Brock observed the child's injuries. He interviewed both the victim and her mother and determined that appellant had caused the injuries. Based upon such, he obtained a warrant for appellant's arrest on the charge of assault in the second degree. He served the warrant on appellant at appellant's home, advised him of his constitutional rights, and transported him to the police station. There appellant was again advised of his rights, but refused to sign a waiver or make a statement. Brock testified that during his interview of the victim, she had told him that appellant had whipped her with a belt. He stated that the injuries on the victim were of the same general width as the belt on appellant when he was arrested. After appellant had refused to make a statement, Brock asked some general information questions which appellant answered. During the course *Page 742 
thereof, Brock informed appellant of the charge against him and that the victim had accused him of beating her with a belt. At that point, Brock removed a western-style belt from appellant and marked it as evidence.
Appellant testified that after he was arrested, he requested to call his father who was an attorney. The request was refused at that time and appellant was told that he could contact him from the police station. Appellant was then transported to the police station. Appellant admitted being given his Miranda
rights at both his home and the police station. He refused to sign or say anything and requested an attorney. Appellant stated that he answered Brock's general information questions and was read the complaint filed against him. During this period of time, appellant was handcuffed to the chair in the office. Appellant stated that Brock informed appellant of the victim's allegation concerning the belt. He stated that Brock then removed his belt and seized it as evidence. Brock prepared a receipt for the belt which appellant refused to sign. Afterwards, appellant was allowed to call his father. Subsequent thereto, he was processed and placed in jail.
Based upon the above testimony, the trial court denied appellant's motion to suppress.
At trial, Brock testified in substance to that which he had testified at appellant's motion to suppress. He produced and identified the belt he had taken from appellant and he stated that the belt had been in his custody since its seizure. Upon its offer into evidence, the trial court initially admitted it. However, appellant objected contending that there had "been no evidence that this belt was the belt that was used to spank this child, or beat her, . . ." The trial court reversed its prior ruling and sustained appellant's objection. Appellant did not move to exclude the above testimony.
After the close of all the evidence and prior to the oral charge of the trial court, appellant moved to exclude the belt from the evidence. The trial court noted that the belt had never been admitted. Appellant then requested to have the jury instructed that the belt was not admitted into evidence. No ruling was made on appellant's request and appellant did not object to the failure of the trial court to rule.
In its oral charge, the trial court instructed the jury that in addition to the sworn testimony of the witnesses, it could consider as evidence "exhibits . . . if they are introduced into evidence. . . . If they have not been admitted into evidence for one reason or another, then you are not to consider them."
Although the arrest warrant was not made a part of the record on appeal, there is no doubt, as evidenced by the testimony recited above, that Brock had probable cause to arrest appellant. See generally Nance v. State, 424 So.2d 1358
(Ala.Cr.App. 1982). In addition, Brock had gained information from the victim concerning the manner in which she had been abused and had personally observed her injuries. With such knowledge he had cause to suspect that the instrumentality which inflicted the victim's injuries was the belt being worn by appellant at the time of his arrest. Thus, it is reasonable to conclude that Brock could have seized the belt at the time of appellant's arrest rather than postpone such until after reaching the police station. Furthermore, while not clear from the record, it appears that there was not an inordinate passage of time between appellant's arrest and the seizure of his belt. When seized, Brock was in the process of obtaining the necessary information for administrative processing and jailing. As stated in United States v. Edwards, 415 U.S. 800,807-8, 94 S.Ct. 1234, 1239, 39 L.Ed.2d 771 (1974):
 "[O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are *Page 743 
immediately seized upon arrival at the jail, held under the defendant's name in the `property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration." (Footnotes omitted).
See generally Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642,18 L.Ed.2d 782 (1967); Harris v. United States, 331 U.S. 145,67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Consequently, the seizure of appellant's belt was proper.
Furthermore, the trial court never admitted the belt into evidence and it was never given to the jury to examine.
Although there was some testimony in the record concerning the belt, appellant never moved to exclude such from the jury's consideration or have it instructed to disregard the testimony. Thus, in this regard, appellant can not now be heard to complain as he did nothing to invoke a ruling and thereby preserve error for review. See Harris v. State, 420 So.2d 812
(Ala.Cr.App. 1982); Brown v. State, 392 So.2d 1248 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1266 (Ala. 1981).
Moreover, the trial court in its oral charge to the jury instructed it as to what was and was not evidence in the case, especially in regard to the exhibits admitted. The instruction was clear and directed specifically to that which appellant now asserts as error.
After a careful reading of the trial court's oral charge as well as consideration of the above facts and circumstances, we find no error in the trial court's actions.
 III
Appellant contends that the trial court abused its discretion in finding the victim competent to testify. He argues that it was error for the trial court to lead the witness in questioning her to determine her competency. He also contends that the victim was not sworn in before testifying.
We quote from the record:
 "THE COURT: Anita, you know that you are in a courtroom here, don't you?
"THE WITNESS: Yes.
 "THE COURT: I am the judge, and these men right here are the lawyers in the case, and these people right over here, they are the Jury. All we want you to do is to tell us what you know, and we want you to tell us the truth. You know what the truth is, don't you?
"THE WITNESS: Yes.
 "THE COURT: You know the difference between telling the truth and telling something that is not the truth, don't you?
"THE WITNESS: Yes.
 "THE COURT: We don't want you to tell a story. All we want you to do is to tell the truth.
"THE WITNESS: Yes.
 "THE COURT: Do you know what happens to people when they don't tell the truth?
"THE WITNESS: Yes.
"THE COURT: What?
"THE WITNESS: They get punished or something.
"THE COURT: They get in trouble, right?
"THE WITNESS: Yes.
 "THE COURT: All right. Now, you understand whatever question is asked to you, if you don't understand the question, you just say I don't understand.
"THE WITNESS: Okay.
 "THE COURT: When you answer and you understand, then you tell them the truth, okay?
"THE WITNESS: Okay.
 "MR. WALDEN: Judge, I would like the Jury excused, and I would like to ask this young lady some questions on competency.
 "THE COURT: All right. Okay, ladies and gentlemen, if you will please step back into the Jury room for a moment." (R. 13-15) *Page 744 
Defense counsel then questioned the victim as follows:
"Q What is you name, darling?
"A Anita.
"Q Anita, how old are you?
"A Six.
"Q You are six?
"A Yeah.
"Q Back in September how old were you at that time?
"A Five.
"Q And when is your birthday?
"A September 3.
"Q September 3?
"A Yeah.
 "Q Do you realize that you have sworn to tell the truth? Do you know what that means?
"A No.
"Q You don't?
"(No response from the Witness.)
 "Q Do you know what the Judge means when he has you to raise up your right hand and you swear that you will tell the truth, the whole truth, and nothing but the truth?
"A (Nods head in the affirmative.)
"Q Do you know that?
"A Yeah.
 "Q Okay. Do you realize what could happen to you if you was to not tell the truth?
"A Yes.
"Q What?
"A Get punished or something.
"Q How would you be punished?
. . . .
 "Q How would you be punished if you did not tell the truth?
"(No response from the Witness.)
 "Q Do you know? I don't want to scare you, darling. I am trying to be as nice as I can. I love little children, so I am not trying to scare you. Don't you be afraid of me. Do you know what kind of punishment you would have if you didn't tell the truth?
 "A Couldn't watch T.V. or couldn't go in somebody's room.
 "Q Okay. Do you know the difference between telling the truth and telling a lie?
"A No.
 "Q You don't? Your Honor, I just think that this witness is not competent to testify." (R. 15-17)
The trial court further inquired of the victim:
"THE COURT: Anita, do you know what a lie is?
"THE WITNESS: Yes.
"THE COURT: What is a lie?
"THE WITNESS: You doing something wrong.
 "THE COURT: You are telling something that is not true?
"THE WITNESS: Yes.
"THE COURT: What is the truth?
"THE WITNESS: Doing something good.
"THE COURT: Telling it the way it is?
"THE WITNESS: Yes.
 "THE COURT: Okay, you can show the Jury out. The Court is of the opinion that the witness is competent to testify. "One other thing. I want you to promise me and everybody here that you are going to tell us the absolute truth and you are not going to tell us something that is not true. Do you understand?
"THE WITNESS: Yes.
 "THE COURT: You are going to tell us the way things happened, and if it didn't then you will tell us what happened, okay?
 "THE WITNESS: (Nods head in the affirmative.)" (R. 17-18)
As to the last contention of appellant, the record reflects that the trial court had the victim "promise" to tell "the absolute truth" and not tell "something that is not true." This clearly served the purpose of swearing an oath to tell the truth in substance if not in form. Prior to the reception of the victim's testimony, the transcript noted that she had "promised to tell the truth." We therefore find no merit to this contention. Rodgers v. State, 42 Ala. App. 660,177 So.2d 460, cert. denied, *Page 745 278 Ala. 712, 177 So.2d 464 (1965); Ala. Code § 12-21-136 (1975); see generally Jones v. State, 398 So.2d 360 (Ala.Cr.App.),cert. denied, 398 So.2d 369 (Ala. 1981).
We also find no abuse of discretion in the trial court asking leading questions of the victim during the preliminary inquiry into her competency. See generally McDaniel v. State,24 Ala. App. 314, 135 So. 421, cert. denied, 223 Ala. 217,135 So. 424 (1931).
Finally, we have completely reviewed all the testimony of the victim and find no error in the trial court's determination as to her competency. Appellant has the burden of establishing the victim's incompetency. Roberson v. State, 384 So.2d 864
(Ala.Cr.App.), cert. denied, 384 So.2d 868 (Ala. 1980). See also Harville v. State, 386 So.2d 776 (Ala.Cr.App. 1980). Consequently, we find no error in the trial court allowing the victim to testify or in denying appellant's motion to strike her testimony. Miller v. State, 391 So.2d 1102 (Ala.Cr.App. 1980).
 IV
Appellant asserts that he was prejudiced by the fact that the victim was not appointed a guardian ad litem pursuant to §26-14-11 Code of Alabama 1975.
Section 26-14-11 Code of Alabama 1975 states that, "In every case involving an abused or neglected child which results in a judicial proceeding, an attorney shall be appointed to represent the child in such proceedings. Such attorney will represent the rights, interests, welfare and well-being of the child, and serve as guardian ad litem for said child." While this section appears to have carte blanche application to all judicial proceedings involving an abused child, we feel that it is directed primarily at protecting the interests of the child in a civil proceeding instituted against the child or in those proceedings attendant to a criminal prosecution for child abuse where the interests of the child conflict with those of the original guardian and/or cannot be adequately represented or protected by the State. Such a conclusion gains support from the nature of the chapter in which the above section appears and the expressed purpose stated therein by the legislature. Ala. Code § 26-14-2 (1975). It is also supported by the definition of guardian ad litem who "is a special guardian appointed by the court to prosecute or defend, in behalf of an infant or incompetent, a suit to which he is a party, and . . . to represent the interest of the infant or incompetent in the litigation." Black's Law Dictionary 635 (rev. 5th ed. 1979).
The two cases cited by appellant, In the Interest of JosephGenusa, 381 So.2d 504 (La. 1980), and State of Louisiana in theInterest of Kendra Brown, 387 So.2d 1366 (La.Ct.App. 1980), are clearly distinguishable from the case at bar. Both of the above cases were civil proceedings having as their dispositive issue the right of the child to counsel and the scope of representation thereof under Article 95 of the Louisiana Code of Juvenile Procedure. Neither case involved a criminal prosecution wherein the child was the victim of abuse. Furthermore, representation for a juvenile is provided for in our rules of juvenile procedure. A.R.J.P. 10, 11 (A), (G), 22.
In Murphy v. State, 355 So.2d 1153 (Ala.Cr.App. 1978), a child, the victim of carnal knowledge, was appointed counsel to represent her pursuant to § 26-14-11. The appointment was made after the child was taken into protective custody by the local Department of Pensions and Security. The defendant was the child's father. The facts as reported in the Murphy case give no indication whether counsel for the child was present at or involved in the criminal proceeding against the defendant. We do not find Murphy to be supportive of appellant's position.
Appellant has not demonstrated in what manner his rights were prejudiced by the failure of the victim to have appointed counsel nor does the record shed light on this issue.
Based upon the foregoing, we do not find reversible error in the fact that the victim *Page 746 
had not been appointed counsel pursuant to § 26-14-11.
 V
Appellant asserts he was denied the opportunity to confront the victim "face to face" during the examination to determine her competency to testify. Thus, he argues that the trial court erred in denying his motion to exclude the victim's testimony.
The above contention, as the previous two issues raised by appellant, arose during the examination of the victim to determine her competency to testify. Immediately prior to appellant's voir dire examination of the victim and after the jury had been excused from the courtroom, the assistant district attorney made the following request:
 "MR. WILLIAMS: Will you instruct the Defendant to stay on his side of the counsel table?
"THE DEFENDANT: I cannot see the witness.
 "THE COURT: We will have her speak up. Just have a seat back over here.
"THE DEFENDANT: Can I stand?
"THE COURT: That will be fine." (R. 15)
Upon conclusion of appellant's voir dire examination and near the end of his argument to the trial court, the trial court made the following statement to appellant:
"THE COURT: Have a seat at the counsel table.
"THE DEFENDANT: I was looking at the witness.
 "THE COURT: I understand that. Follow the rules as I have set them up." (R. 18-19)
Direct examination of the victim began, but was interrupted by the trial court after one question was asked in order that "a five minute recess" could be taken. Afterwards, the examination of the victim was resumed and completed. Appellant then moved to exclude her testimony. The jury was excused and the trial court, in denying the motion, made the following statement:
 "THE COURT: Okay, on this ruling, the Court would make the following observations: Any question that was asked the little girl that anybody didn't hear, we asked it be repeated or repeated the answer so that they could. There was no other requests that I know of.
 "The first time she came in here to testify, to what Mr. Walden refers to, the Defendant gets out of the chair at counsel table and walked around and stood right in front of the witness, and the Court had to take a 15 minute recess so that the little girl could get her composure back. I just want to make sure that the record reflects exactly what happened, and at that point in time I instructed the Defendant to take a seat at counsel table and not walk over here and stand right in front of the little girl." (R. 37-38)
At the hearing on appellant's motion for a new trial, one of appellant's attorneys, Raymond Johnson, testified that he was seated to appellant's left during the above examination of the victim. He stated that appellant was around ten to twelve feet away from the victim and slightly nearer the witness stand than he. From his seat, Johnson stated that he could neither see nor hear the victim. After appellant had left his seat, Johnson moved to appellant's chair and to the middle of the defense table but still could not see. Finally, Johnson stood and could then see and hear the victim. Johnson stated that he did not see appellant make any threatening gestures or motions toward the victim while appellant was away from his seat. The trial court questioned Johnson as follows:
 "THE COURT: I have a few questions. Were you there when the Defendant, without any permission from anybody, got up, walked around the table and started walking toward the witness?
"THE WITNESS: I was there when he stood up.
 "THE COURT: And ended up about five or six feet from the witness and the witness broke down and started crying and the Court had to call a recess?
 "THE WITNESS: I could not see the witness at that time. I do not know *Page 747 
what her deameanor was. I did see him get up and leave the table and get closer so he could see.
 "THE COURT: He walked around the table, the side of the witness and walked toward the witness and stood there and looked at her at which time the witness immediately broke down and started crying.
 "THE WITNESS: I don't know whether she started crying or not. I could not see her. I saw him get up.
"THE COURT: You didn't see the witness crying?
"THE WITNESS: Not until after Court had recessed.
 "THE COURT: And when Court recessed the witness was crying, wasn't she?
"THE WITNESS: Right.
 "THE COURT: Is it so as stated by Mr. Lynn in his affidavit that after I told him to go back over there and sit down and he was allowed to stand beside his chair?
 "THE WITNESS: I believe . . . I'm not sure about that, Judge." (R. 176-177)
Johnson further testified that appellant got up from his seat and sat in the assistant district attorney's chair, which was located directly in front of the witness. Upon the request of the assistant district attorney, appellant moved and then walked toward the victim. Johnson stated that he was aware that the victim began crying at some point during this time but was not sure whether such occurred before or after the recess.
Horace Lynn, an attorney, testified that he was a spectator during this portion of appellant's trial. He was seated on the front row of the courtroom. Lynn stated that from his location he could not understand the victim's testimony. He stated that the victim was not emotional when she was brought into the courtroom and was not so until some point after appellant had gotten out of his seat. Lynn testified that he heard the victim crying after the trial court had instructed appellant to sit down. Lynn stated that during this incident appellant had moved to the end of the State's table, which was the table closest to the witness stand.
Appellant testified that contrary to the advice of one of his attorneys, he got out of his chair and moved. He admitted not asking or having permission from the trial court to do such. Appellant stated that he moved to and sat in the assistant district attorney's chair. At the request of the State's prosecutor, appellant left the chair and sat in a chair located at the State's table. After a short period of time, he was again asked to move at which time appellant got up and asked the trial court for permission to stand. The request was granted and appellant moved to the next closest chair at the defense table and stood behind it. From this and the earlier positions, appellant stated that he could see and hear the victim. Appellant denied that he moved to the end of the State's table. He stated that throughout this incident, his view was obstructed.
Based upon the foregoing, we find no breach of appellant's Sixth Amendment right to confront the witness. Before the trial court was a young girl who had been physically abused by appellant. The trial court was aware that the witness might become upset. In order to ensure that the witness' testimony be understandable and of some worth to the State, appellant, and the jury, the trial court properly treated the examination of the victim with delicacy. The record is clear that appellant's proximity to the witness caused her discomfort thus necessitating a recess. The possibility of appellant intimidating the victim was present, regardless of her subsequent testimony stating that she was not afraid of appellant.
Appellant was never removed from the courtroom and thus denied the opportunity to view the examination of the witness. Rather, he was given much leeway in moving freely about the courtroom. It was only when appellant's actions began to disrupt the conduct of the trial that his movement was limited. However, the trial court granted appellant's request to stand in order *Page 748 
that he might observe and hear the victim better. No situation arose where testimony was taken from the witness without the presence of appellant and his counsel. Appellant and the witness were physically present in the courtroom at all times. See generally, Allison v. State, 331 So.2d 748 (Ala.Cr.App.),cert. denied, 331 So.2d 751 (Ala. 1976).
The trial court exercises discretion in the conduct of a trial, and unless clearly abused, such will not be overturned on appeal. The trial court exercises this discretion in light of the facts and circumstances of each case. Thomas v. State,393 So.2d 504 (Ala.Cr.App. 1981); Snipes v. State,364 So.2d 424 (Ala.Cr.App. 1978). The cases of Wray v. State, 154 Ala. 36,45 So. 697 (1908), and Strange v. State, 43 Ala. App. 599,197 So.2d 437 (1966), cert. denied, 280 Ala. 718, 197 So.2d 447
(1967), upon which appellant heavily relies, are not applicable to the facts of the instant cause.
Appellant's movements might have been a good deal more restricted at the court's discretion. "Considerations for the safety and security of all persons present in the courtroom, including the defendant, and for the judicial process itself, justified the trial judge in feeling that it was unwise to allow defendant to wander freely about the courtroom." Peoplev. Chessman, 238 P.2d 1001, 38 Cal.2d 166, cert. denied,Chessman v. People of State of California, 343 U.S. 915,72 S.Ct. 650, 96 L.Ed. 1330, rehearing denied 343 U.S. 937,72 S.Ct. 773, 96 L.Ed. 1344.
 VI
Appellant asserts that the trial court erred in admitting evidence of his prior conviction and prior criminal acts involving the victim.
 A
Appellant initially raised the instant issue through a motion in limine. However, the record illustrates that although the trial court thought the prior conviction would be admissible, it withheld ruling on appellant's motion "until we get to that in the time of the trial. . . ." Thus, there was no ruling on appellant's motion from which he could appeal.
 B
The victim's testimony concerning prior incidents similar to the one now under scrutiny was admissible as being relevant to prove intent and to show motive. Likewise, Cecilia Melton's testimony concerning the same was also admissible. Carlton v.State, 415 So.2d 1241 (Ala.Cr.App. 1982); Graham v. State,403 So.2d 275 (Ala.Cr.App. 1980), cert. denied, 403 So.2d 286 (Ala. 1981); Howton v. State, 391 So.2d 147 (Ala.Cr.App. 1980).
 C
On his cross-examination of Cecilia Melton, the victim's mother, appellant focused his defense on the theory that Melton caused the injuries giving rise to the instant prosecution. Melton's testimony regarding appellant's threats against her and his physical abuse of her was highly competent to illustrate why she did not act to prevent appellant's abuse of the victim and thus it explained her cross-examination testimony and rebutted appellant's theory of defense. We find no error in the admission of the testimony.
 VII
The trial court sustained many of appellant's objections during the rebuttal testimony of former Montgomery County Department of Pensions and Security crisis unit investigator Andy Beckham. At the conclusion of his testimony, the trial court granted appellant's motion to exclude Beckham's testimony and instructed the jury to "disregard the testimony of this witness." Thus, no adverse ruling exists from which appellant may now complain. Trawick v. State, 431 So.2d 574
(Ala.Crim.App. 1983); Van Antwerp v. State, 358 So.2d 782
(Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala. 1978). *Page 749 
 VIII
No error was committed by the trial court in allowing the State to question appellant about a prior conviction. Appellant had pled guilty to assault in the third degree of this same victim following an incident that occurred in February, 1981. The record reveals that the 1981 incident was similar in nature to the one in the instant inquiry. Although the prior conviction was a misdemeanor and may not involve moral turpitude, it was admissible under the intent and motive exceptions to the general rule prohibiting evidence of collateral acts. The above inquiries are pertinent when the prior conviction is not offered solely for the purpose of establishing the accused's bad character. See authorities cited in Part VI, B, supra. See generally Partridge v. State,431 So.2d 1377 (Ala.Crim.App. 1983).
We disagree with appellant's contention that the State improperly admitted the details of the prior conviction. The State displayed to appellant but not to the jury, some photographs apparently part of the record of the prior crime to rebut appellant's testimony that his conduct on that occasion was nothing more than a "simple spank." It also rebutted appellant's testimony concerning the sensitive nature of the victim's skin and his testimony that the injuries were caused in some degree by "bed-wetting." The State did not divulge or question appellant about the specifics of the prior conviction per se. The photographs were not admitted into evidence. Thus, we find no error in this regard.
 IX
The photographs of the victim were properly admitted into evidence. Although six of the twelve photographs contained extraneous matter written on their backs, the trial court had the writing on each covered with sheets of opaque paper taped thereto. It instructed the jury not "to look behind" the paper as "whatever is being covered up is improper for you to see and consider." The trial court admonished the jury not to "peel that off. It is covered up. Leave it covered up." We find the action of the trial court sufficient to protect appellant from any prejudice which could have resulted from display of the writings to the jury. Washington v. State, 415 So.2d 1175
(Ala.Cr.App. 1982); Elmore v. State, 414 So.2d 175 (Ala.Cr.App. 1982); Donner v. State, 409 So.2d 461 (Ala.Cr.App. 1981).
 X
We have reviewed the three instances noted by appellant in his brief where he alleges that the trial court improperly suggested to the State the proper manner in which to admit evidence and we find no reversible error. In the first instance, the trial court twice sustained objections by appellant to the State's questions and in one instance the court stated that if the State would ask proper questions it would admit the testimony. In the second instance, the trial court again sustained appellant's objection and told the State to attempt to lay the proper predicate for the testimony. In the last instance, the trial court inquired of the State which photographs it was about to use in examining a witness.
 XI
Appellant's contentions concerning the trial court allowing the jury to carry the indictment with it while it deliberated and in failing to cover the amount of appellant's bond ($40,000) which was written on the back thereof have been answered to his detriment in Herring v. State, 401 So.2d 296
(Ala.Cr.App. 1981), and Thomas v. State, 399 So.2d 915
(Ala.Cr.App. 1981).
The trial court thoroughly instructed the jury that the indictment was not evidence to be considered in reaching a decision. Further, it gave appellant's written requested charge covering the same point. While appellant did move to have the amount of his bond covered from the jury's view, his contention that display of such to the jury would prejudice it against him is pure speculation. There is nothing in the *Page 750 
record to suggest that the jury did not follow the instructions of the trial court which had carefully charged it as to the composition of the evidence. Appellant's contention is conjectural and does not mandate reversal of this cause.
 XII
Appellant raises three issues concerning the trial court's oral charge. In one instance, appellant asserts that the trial court failed to instruct the jury on the principle expressed in § 13A-3-24 (1) Code of Alabama 1975. Appellant offered no written requested charge to cover the alleged omission. In the latter two instances, appellant argues that the trial court erred on two specific occasions in the manner in which it charged the jury. Appellant made no timely, specific objection to such. Thus, in none of the situations did appellant properly preserve the issue for our review. See Byrd v. State,421 So.2d 1344 (Ala.Cr.App. 1982); Brooks v. State, 418 So.2d 195
(Ala.Cr.App. 1982); Yates v. State, 390 So.2d 32 (Ala.Cr.App. 1980).
 XIII
Lastly, appellant contends that the trial court erred in refusing nine of his thirty-four written requested charges. We have carefully reviewed the record and find that appellant not only failed to call to the attention of the trial court the specific refused written charges but he also failed to set forth any specific grounds for his objection to their refusal.Johnson v. State, 433 So.2d 479 (Ala. 1983); Knight v. State, ___ So.2d ___ [Ms. 4 Div. 7, May 3, 1983]; Allen v. State,414 So.2d 989 (Ala.Cr.App. 1981), aff'd, 414 So.2d 993 (Ala. 1982).
The trial court, in its colloquy with appellant, identified in substance two of the refused charges, numbers six and nine. We have reviewed those charges and find them to be misstatements of the law. Consequently, they were properly refused.
The judgment of the circuit court is hereby affirmed.
AFFIRMED.
All the Judges concur.