The appellant was convicted of murder, in violation of §13A-6-2, Code of Alabama 1975. He was sentenced to life imprisonment and was ordered to pay $2,692.28 in restitution.
 I
The appellant argues that the State failed to prove a prima facie case of murder, because, he says, the verdict was contrary to the great weight of the evidence. According to § 13A-6-2, Code of Alabama 1975, a person commits the crime of murder if, with intent to cause the death of another person, he causes the death of that person or another person.
The State presented evidence that Oneida Reynolds divorced Joe Reynolds, Sr., the father of her three children: a son *Page 24 
age three; a daughter, less than 12 months old; and another daughter, the victim, two years of age. The children originally lived with Oneida Reynolds's mother, but two weeks prior to December 4, 1988, they came to live with Oneida Reynolds and the appellant. Because Mrs. Reynolds worked during the day, the appellant kept her children. The appellant was allowed to discipline the children and Oneida Reynolds testified that she observed him whip her son with a belt on six or seven occasions and that, on one occasion, he whipped the boy for 10 to 15 minutes with a belt. The State further presented evidence that when the victim saw the appellant she would begin to shake and get into the fetal position to protect herself. The appellant's next door neighbors, Oneida Reynolds, and the appellant, were the only people who kept the children. The next door neighbors testified that, during the week prior to December 4, 1988, the appellant brought the children over for them to baby-sit. They testified that he slung the boy down on the couch, causing his head to hit the wooden part of the couch. He grabbed the victim by the arm pit and threw her to the couch. He then told the children that "they had better not move while he was gone" or "they knew what would happen with the belt." The neighbors testified that the children said nothing and stared at him. After the appellant left, the children did not move and continued to sit motionless. The neighbors testified that the boy had a bruise on his face. They further testified that, on another occasion, the appellant brought the children over, lined them up on the floor, and made them sit "Indian-style," telling them not to move. They testified that the children were scared and were shaking.
Another witness for the State testified that, during the two weeks in which the children lived with the appellant, she would visit their house daily. She stated that, each time she was there, the children were lined up on the floor and did not move or speak. She stated that they faced the kitchen and not the television. She further testified that a belt always either was lying on the table or was in the appellant's hands. She stated that the appellant indicated that, when he was home, they were going to sit like that and that he was training them. He stated that he did not want the children. She further testified that, on one occasion, she saw the victim attempt to get up from the floor; she said the appellant picked the child up by her arm pit, and threw her back to the floor, warning her not to move or he would grab the belt. On another occasion, she observed the victim standing in the middle of the floor with her legs spread far apart and her arms stretched out. She testified that the appellant indicated he was punishing her for wetting her pants and that she would stand like that for three to four hours. On the morning of the offense, Oneida Reynolds called a friend and told her that the victim was limp, that she could not walk or feed herself, and that she could not move. Oneida Reynolds testified, however, that when she returned home later that afternoon, she was told that the victim was fine. As she was taking a bath, the appellant borrowed her car keys to take a friend to the store. The friend testified that the appellant appeared to be very nervous and told her to hurry. She further testified that, when they returned to the appellant's house, he rushed inside. Oneida Reynolds then left to get a tire fixed and do some shopping. Ten to fifteen minutes later, the paramedics were called by the appellant, and they arrived in approximately five minutes. The next door neighbors testified that they went to the appellant's house to investigate and observed the victim on the floor. The appellant was in a chair and appeared to be nervous and shaking. The belt was on the table. They testified that the appellant picked up the belt, threw it on the floor, and said, "Damn!" The appellant stated that the victim had fallen off the commode. He stated that he had done CPR for approximately 30 minutes before he telephoned the paramedics. A paramedic testified that there were no contusions on the victim's head, that she had no pulse, that her pupils were dilated and fixed, and that she appeared to have been dead for approximately 20 minutes. *Page 25 
An autopsy was performed on the victim, revealing bruises all over her body. The coroner testified that there were bruises on her ears, skull, scalp, cheeks, chest, arms, legs, buttocks, thighs, and knees. He stated that most of the bruises were fresh. She had a hematoma inside the left part of her brain that was approximately 24 to 36 hours old. He testified that, although an adult might get a hematoma from falling from a commode, a child would not. The coroner stated that, in his opinion, this trauma could result from a severe blow or from a violent shaking. He testified that the cause of the victim's death was multiple blunt force injuries and acute subdural hematoma to the left side of the brain. He further testified that the hematoma was inflicted prior to the bruises.
Thus, the State provided sufficient circumstantial evidence to exclude every reasonable hypothesis but that of the accused's guilt. Cumbo v. State, 368 So.2d 871, 874
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). There was legal evidence presented from which the jury, by fair inference, could have found the appellant guilty beyond a reasonable doubt. Prantl v. State, 462 So.2d 781
(Ala.Cr.App. 1984).
 II
The appellant argues that the trial court erred in allowing evidence concerning the victim's brother's injuries to be admitted at trial. The record indicates that on the day after the victim's death, Oneida Reynolds, the appellant, and the other two children went to Oneida Reynolds's parents' home in Chipley, Florida. That evening, police officers from the Dothan Police Department drove to the home of Oneida Reynolds's parents. Sergeant Jackie Mendheim, of the Dothan Police Department, testified that he observed the three-year-old boy lying on a couch. He further testified that he picked up the boy and that the boy then opened his eyes. He testified that he asked the boy a question, which he answered, and that then his eyes rolled back in his head and his head fell over. Oneida Reynolds's mother testified that the police officer asked the boy how he got the bruise on the side of his head. The boy responded that he had been hit with a belt and pointed to the appellant. When the officer asked the boy who hit him, he made no further response. A neurosurgeon examined the boy in the emergency room in Dothan and testified that he had an acute subdural hematoma, such as would be caused by trauma. He further testified that the hematoma was as old as three to four days. He further testified that the child had bruises over his body and that, had he not been treated, he could have died from that.
Thus, the victim and her brother had similar injuries, which were apparently inflicted at approximately the same time. The evidence concerning this collateral offense to the victim's brother was admissible pursuant to the identity and res gestae exceptions to the exclusionary rule. In the present case, the appellant did not take the stand; however, in his statement, he maintained that the victim's death was caused due to a blow she suffered from falling off the commode. Furthermore, at trial, the appellant presented evidence that the victim's father was a criminal and could have committed the acts. Thus, identity was placed at issue. Cf. Reeves v. State, 570 So.2d 724
(Ala.Cr.App. 1990). Moreover, there was a showing that the abuse and injuries of the victim and her brother were committed in a characteristically similar manner. Ex parte Darby,516 So.2d 786, 789 (Ala.Cr.App. 1987), citing Allen v. State,478 So.2d 326 (Ala.Cr.App. 1985); Brewer v. State, 440 So.2d 1155
(Ala.Cr.App. 1983).
It is also clear from the State's evidence that the subdural hematomas suffered by the victim and her brother occurred at the same approximate time; 24 to 36 hours prior to the victim's death. "While evidence of offenses separate from that for which a person is being tried is normally inadmissible, where, as here, the offenses occur within one continuous transaction, evidence of their commission by the accused is admissible.Johnson v. State, 355 So.2d 1160 (Ala.Cr.App. 1978); Gamble,McElroy on Evidence, § 69.01(3) (3d ed. 1977)." *Page 26 Love v. State, 372 So.2d 414, 416 (Ala.Cr.App. 1979). See alsoGoff v. State, 574 So.2d 1035 (Ala.Cr.App. 1990).
The testimony concerning the appellant's other prior bad acts against the victim and her brother was also admissible as exceptions to the exclusionary rule. Evidence of these other bad acts was not admitted to show the appellant's bad character, but rather was admissible under the motive, intent, and common plan or scheme exceptions to the exclusionary rule.
 " 'In a prosecution for murder, evidence of recent abuse to the child by the accused is admissible to show "intent, motive or scienter." . . . Acts of hostility, cruelty, and abuse by the accused toward his homicide victim may be proved by the State for the purpose of showing motive and intent. . . . This is "another of the primary exceptions to the general rule excluding evidence of other crimes." ' Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App. 1983) (citations omitted). See also Baker v. State, 441 So.2d 1061, 1062
(Ala.Cr.App. 1983)."
Eslava v. State, 473 So.2d 1143, 1146 (Ala.Cr.App. 1985). See also Burkett v. State, 439 So.2d 737, 748-49 (Ala.Cr.App. 1983).
Evidence of these prior bad acts was also admissible to show a common plan and scheme by the appellant, as indicated by the testimony of a State's witness who stated that the appellant had told her that he treated the children in such a manner because he was "training" them and because he did not want them. "Evidence of the accused's commission of another crime is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime were committed in keeping with or pursuant to a single plan, design, scheme, or system, whether narrow or broad in scope." Nicks v. State, 521 So.2d 1018, 1027
(Ala.Cr.App. 1987), affirmed, 521 So.2d 1035 (Ala. 1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), citing C. Gamble, McElroy's Alabama Evidence § 69.01(6) (3d ed. 1977).
Thus, the trial court did not err in allowing the State to introduce evidence of these collateral offenses.
 III
The appellant argues that the trial court erred in refusing to allow him to elicit testimony that the victim's father had hit her. The record indicates that Yvonne Harris was called by the defense and testified that she had baby-sat for the victim and her brother previously. Defense counsel asked if she ever observed the victim's father hit the victim. The prosecutor objected on the grounds that a proper predicate had not been laid as to the time frame. The trial court sustained the objection. The witness was unable to remember the time; however, she eventually concluded that it must have been in the summer of 1988. The prosecutor objected to the question on the grounds of remoteness, as the instant offense occurred in late November of that year. The trial court sustained the prosecutor's objection.
The victim's mother testified that the victim's father was never around the children at any time subsequent to the parents' separation on October 19, 1988. The evidence indicated that the victim's injury occurred within 36 hours of her death on December 4, 1988. Thus, the admission of any evidence concerning the father's abusing her would have been remote and irrelevant, and would have tended to cloud the issues the jury was required to resolve. Gullatt v. State, 409 So.2d 466, 473
(Ala.Cr.App. 1981). "The admissibility of evidence, which has been challenged as irrelevant and remote, is within the sound discretion of the trial judge. A trial judge's decision to admit or exclude such evidence will not be overturned on the appeal absent an abuse of his discretion." Primm v. State,473 So.2d 1149, 1157 (Ala.Cr.App. 1985). See also Robinson v. State,405 So.2d 1328, 1334 (Ala.Cr.App.), cert. denied,405 So.2d 1334 (Ala. 1981). We find no such abuse of the trial court's discretion in the present case. *Page 27 
 IV
The appellant, who is black, argues that he was denied his right to equal protection, because, he contends, the State used its peremptory strikes in a racially discriminatory manner. The record does not contain a transcript of the voir dire questioning of the jury panel. Defense counsel made an objection based on this ground and stated that there were 51 people on the original jury list; however, because a number were taken off as being not available, there was a total of 42 potential jurors. Nine blacks were on the panel. The appellant and the State each had 15 strikes. The State struck six of the blacks, leaving three blacks on the jury. Thereafter, the prosecutor came forward with reasons for his strikes and stated as follows:
 "MR. VALESKA: First of all, let me start at the bottom and work up to the top. Mrs. Trant [circuit clerk], if you will, help me with some of these numbers. The first one on the bottom of the page that I show is number forty-five, W.H. She approached the Bench in response to questions on behalf of the State or the Defense or the Court; all of the Jurors were given an opportunity to come forward on a certain type of question. I show that Mrs. H. stated we had, in fact, prosecuted her son . . . for drugs. And, I asked her if we had prosecuted any member of their family, either myself or my office. And, she said that they had. Coming forward, I think she will be biased and we respectfully, because we sent her son to the penitentiary for drugs, that is the basis for striking Mrs. H. Number forty-one, going up to the Court in response to whatever question there was, it was the first time she had ever had a chance to be on a Jury Panel and she was extremely nervous. The question was also asked of her as well as all the rest, I didn't mean to skip anything, about whether the State, myself or my office had prosecuted any member of their family for whatever reason. Mrs. G. admitted when I asked her, she did not volunteer to tell the Court when she came up to make known that she was just nervous, that, in fact, my office prosecuted her and sent her son . . . to the penitentiary. I asked her if he was her son and she said it was and that is the basis for striking Mrs. G. I sent a member of her family to the penitentiary. Let's see, let's move on up, number thirty-four, K.F. I asked if he was related in any way to J.F. That is the one I know that works at the car wash place who has a speech impediment and was a Defendant in Family Court where we prosecuted him for back child support, attempting to make him pay child support. He has been in that Court numerous times. In fact, I want to say, I think it was Mr. Bullard that was his lawyer. He said that yes, he knew J.F. and were acquaintances. He also said he, I think it was his wife that was related by blood or marriage to M. I didn't get the whole name, and that kind of relationship to that individual. As I recall what I have know, somebody was related to one of the members of the defense witnesses and that is the basis. I am going back over employment in my mind, but he was struck. Let's go up to R.E., Number twenty-six. Mr. E. responded and requested that he did not know Joe Reynolds, Sr., the father in this case. My information is that there will be testimony offered regarding negotiations taking place between the Defense and my office that Joe Reynolds, Sr., and we have the DPS report to the Defense that he has beat his wife. There may be some testimony regarding that Joe Sr. is the one that took the child's life or beat this child. He stated that he had seen him since this thing, but I don't want Mr. R.E. on the panel if he knew anything about Joe Sr. Because, the Defense would bring that out as the one that possibly took the child's life. And, on that basis, I didn't want him sitting on the panel knowing the allegations about Joe Reynolds, Sr. that is the basis for his strike. N.D., number twenty-three. Mrs. D. approached and stated she had heard something about the case when questioned by the Defendant. Really couldn't give any specifics as to whether *Page 28 
it was this Defendant or could have been a child hurt. I struck her on a couple of reasons. The main reason was she resigned from the Houston County Sheriff's Department. I asked her specifically when we were in conference, would she hold that against me or on this case in any way. And she said no. I don't know the real justification for her resignation, she didn't volunteer it. I tried to find out from the Sheriff's assistant. I wanted to run and see Kay, but I was doing Voir Dire and I couldn't talk to her. Another reason I struck her as to whether or not a man and woman and mother of the victim were living together and would bother her that they were living together and the children were allowed to be disciplined by him. I could not get Mrs. D's name when I asked, but she raised her hand about the living together and stated that wouldn't bother her at all. I didn't like that response, because that is a key issue; an individual living with another individual and not married to each other, doesn't have the authority to discipline those children when they are not his. That is a key issue in the trial here. Let me go on up to, correct me if I am wrong, I believe the next individual is — did I strike Number eleven?
"MRS. TRANT: Seven
 "MR. VALESKA: All right. Number seven, B.H.B. She gave a response that she was an acquaintance, as I was putting it down, that she knew one of the witnesses for the Defense. She was an acquaintance, but I didn't get down what all it was. She was basically young, thirty-five years of age, born in 1953, a machine operator. And, I was concerned about her having sympathy for the Defendant and worried about the acquaintance she had with a witness. She was not struck because she was Black in any way. I believe that is all the strikes. Is that correct?
"MRS. TRANT: Yes.
 "MR. VALESKA: I would like to respond that first, I think for them to show that I am systematically, myself, me, in this case, I am the District Attorney and it is the office that I hold that I am systematically striking Blacks because of race. I think I showed there was three individuals left on the panel that Ms. Nemish said were Black and that is a twenty-five percent rate. I don't know of any recent studies that have been done but, I think you can take judicial knowledge of the fact that I believe twenty-five percent of the population of this Venire, on this panel, would be fairly balanced racially. There were other Blacks on the Venire, other individuals that I could have struck them off. That was not my intent to strike all of the Blacks. My concerns were the reasons that I gave. If you can give me one minute ___ Mrs. D. stated concern about her employment two or three times. She said that because of the type of job that she had, because she had just recently went to work for K-mart. Let's see ___ K.F., also, he was one of the individuals, as I recall, that came up to the Bench when you asked if there was a problem. He stated that his wife was working part-time and he needed to work. And, he wanted to get out there and get paid. And, the Court pointed out to him that he would be able to get his money. He was very concerned about that and I was concerned about whether or not, because of that, that he might be biased against us. Mrs. G. was another individual that approached your Bench and stated she was a driver at SEATS, I have jotted down in my notes. And, that she was a driver and that on Friday, there was only one other driver and that would cause problems and she needed to give notification as to how far it would go. And, you said that you expected only to go through Thursday and she expressed her concern about her employment, at that time. W.H. also showed no employment or spouse on our Jury list. And, I think, let me make sure I have got no other names here ___ I think that is pretty much it."
Following the State's explanations for its strikes, the trial court held that the reasons were sufficient and overruled the motion. *Page 29 
The appellant argues that the reasons given by the prosecutor were insufficient, "highly suspect," and merely masked the prosecutor's real intention of striking on the basis of race. However, the trial court was in a better position to determine whether the truth had been stated. Scales v. State,539 So.2d 1074, 1075 (Ala. 1988).
 " 'In reviewing the trial court's finding that the strikes were nondiscriminatory, we can only reverse if we find that that determination was clearly erroneous.' Williams [v. State], 548 So.2d [501] at 504 [(Ala.Cr.App. 1988)]. Accord, Ex parte Branch, 526 So.2d [609] at 624 [(Ala. 1987)]. ' "In a Batson [v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)] context, the Supreme Court observed that because the trial judge's findings 'largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' Batson, 476 U.S. at 98, n. 21 [106 S.Ct. at 1724 n. 21]." ' Owens v. State, 531 So.2d 22, 23 (Ala.Cr.App. 1988), quoting State v. Antwine, 743 S.W.2d 51, 66
(Mo. 1987), cert. denied, [486] U.S. [1017], 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). 'In reviewing the lower court's ruling, we have been mindful that it is not our function to decide this issue de novo to "duplicate the role of the lower court." ' Owens, 531 So.2d at 24. The finding of the trial judge 'is entitled to considerable deference on appeal.' Harrell [v. State], 555 So.2d 263
[Ala. 1989]. See also Scales v. State, 539 So.2d 1074, 1075 (Ala. 1988). ('[W]e are convinced that the trial judges in our system are in a much better position than appellate judges to decide whether the truth has been stated')."
Stephens v. State, 580 So.2d 11 (Ala.Cr.App. 1990), quotingWarner v. State, [Ms. 3 Div. 945, Feb. 23, 1990] (Ala.Cr.App. 1990). The reasons submitted by the prosecutor were valid and sufficiently race-neutral reasons. Stephens, supra;Warner v. State, supra; Powell v. State, 548 So.2d 590, 592-93
(Ala.Cr.App. 1988); Scales v. State, 539 So.2d 1074, 1974-75
(Ala. 1988); Harrell v. State, 555 So.2d 263, 268, n. 1 (Ala. 1989); Harris v. State, 545 So.2d 146, 147
(Ala.Cr.App. 1988); Currin v. State, 535 So.2d 221
(Ala.Cr.App.), cert. denied, 535 So.2d 225 (Ala. 1988).
AFFIRMED.
All the Judges concur.