COBB, Judge.
On August 16, 2000, Vetra Lillette Adams was convicted of possession óf a controlled substance (cocaine), a violation of § 13A-12-212(a)(l), Ala.Code 1975. The trial court sentenced Adams to serve two years in prison, but suspended the sentence and placed Adams on probation for two years. This appeal followed.
Adams argues that the trial court abused' its discretion by granting the State’s motion in limine seeking to exclude evidence that, just before her arrest, Adams had filed a complaint against a police officer for rape. Specifically, Adams sought to show that the officer who arrested her worked in the same precinct as the officer she had complained of, that the arresting officer knew about the complaint Adams had filed against his fellow officer, and that Adams’s arrest was part of a conspiracy to retaliate against her for filing a complaint. Although Adams presents four issues on appeal, because the issue regarding her conspiracy defense is dispositive of this case, we do hot address her other issues.
The evidence presented at trial showed the following: In the early morning hours of November 14, 1998, Adams was pulled over by Officer Lonnie Graham because her tag light was not working. Officer Graham took Adams’s driver’s license information and placed her in the back of his patrol car because, he testified, he believed her to be a flight risk. After discovering that Adams’s driver’s license had been suspended, Officer Graham removed Adams from the patrol car and had her stand on the sidewalk while he removed the backseat of his patrol car and conducted a search. Officer Graham testified that he found a small, clear bag containing several other smaller bags, which contained crack cocaine. Officer Graham handcuffed Adams and placed her back in his patrol car. While inventorying Adams’s vehicle, Officer Graham discovered a crack pipe.
At trial, Adams sought to introduce evidence that she was set up and targeted by the police. Adams maintained that the officer who arrested her was out to get her because she had previously filed a complaint against an officer who worked in the *229 same precinct as the arresting officer. After a hearing on the State’s motion in limine to exclude evidence that Adams had filed a complaint with the Birmingham Police Department, the trial court held that evidence of the circumstances surrounding the filing of the complaint was inadmissible.
“THE COURT: Let the record reflect the State has filed a motion in limine. [Defense counsel],, have you gotten a copy of it?
“[Defense counsel]: Yes, Your Honor.
“[Prosecutor]: Yes, sir. The State understands that the defense will be offering evidence in this case regarding a complaint filed by the defendant regarding the police department, regarding some sexual activity with a Birmingham police officer. This occurred approximately three months prior to the defendant’s arrest for possession.
“It’s the State’s position that this evidence would be irrelevant to this case. The question before the — the question before this Court as to whether the defendant possessed the controlled substance.
“It’s also the State’s position that the prejudicial value of this information or this evidence greatly outweighs any probative value it has regarding the issue before the Court in this trial.
“We request that the defense be barred from making any mention of that situation or those facts or that evidence at all during this trial.
“THE COURT: All right. [Defense counsel]?
“[Defense counsel]: Your Honor, it’s the defendant’s theory of the case that this is a wrongful prosecution and that it is a case of a revenge or payback by a Birmingham police officer, this Officer Graham who made the case.
“Officer Graham worked with Brandon Jackson who is an individual who formerly was employed with the Birmingham Police Department. He answered a call in August of 1999, or 1998 — I am sorry — at the home of Ms. Adams—
“THE COURT: Who answered a call?
“[Defense counsel]: Brandon Jackson. So just to give- the Court a little bit of background of-what the allegations are to make it ’make sense to the Court, Brandon Jackson was an officer who was called to their home. He — Ms. Adams’s husband left. Subsequently, he interviewed Ms. Adams and one thing led to another and he threatened her with [the Department of Human Resources] coming to her home and looked in her crotch and said he wanted some of that, and 'So forth and so on. And he raped Ms. Adams, had sex with her without her consent. She was six and a half months pregnant at the time.
“Thereafter, Ms. Adams and her — her husband returned home and found Mr. Brandon Jackson having sex ■ with his wife, jumped up and said, ‘What in the world is going on? I am going to call a real police officer.’ Went over, called the police that came, did a report. We furnished, the State with a copy of that report that transpired.
“About a month later, Ms. Adams was arrested on this charge. The evidence will show that Officer Graham worked at the same precinct as Officer Jackson and that at the time that he arrested her, he made some comment to the effect of, T am not worried about you so much as I am worried about my brother Brandon.’
“Ms. Adams said, ‘Brandon was your brother. Oh, my God, Brandon was your brother. Brandon Jackson was your brother.’
*230 “The officer responded, ‘We are all brothers in this game.’
“Whereupon, she was taken to the station. And it was known around the precinct that she was the one that had made the complaint against Jackson.
“This allegation, Your Honor, involves narcotics allegedly found in the back of a police officer’s car. She has entered a plea of not guilty. She is contending and it is our theory of the case that this is a payback case of a fellow police officer that worked with Officer Jackson, that was showing her who was boss or what would happen if she had pursued this, and did, in fact, pursue this, that led to this individual’s losing his job.
“It gets a little bit more involved. Brandon Jackson and a couple of the others actually contacted Ms. Adams — I guess we might as well go ahead and go into this aspect of it as well, Your Hon- or — called her by telephone. She taped the phone call — which we have furnished a copy of the tape to [the prosecutor]— begging her not to turn him in and not to pursue anything and begging for his job and so forth and so on.
“THE COURT: When did that take place?
“[Defense counsel]: That took place on the eve of the sexual assault or if not the eve, within hours of the sexual assault, he telephoned her.
“Internal Affairs got after him, did an investigation, he had to quit.
“His precinct buddy, for whatever reason, our information is Officer Graham decided to take up Officer Jackson’s cause by planting drugs on Ms. Adams or in the back of the patrol car and claiming that she possessed them. She has no prior drug history, no prior history of any type of real criminal history to any extent. And she has always claimed and her theory has been that these are not her drugs, that she didn’t possess them and had no ability or no dominion and control or none of that that goes into constructive possession, that in fact, this was a police officer payback-type of case.
“THE COURT: When was Officer Jackson terminated?
“[Defense counsel]: Your Honor, the letter that Ms. Adams received is dated October 9, 1998. She was arrested November lh, 1998. We don’t — -I don’t know exactly the date of Ms termination. I have some—
“THE COURT: This phone call you referred to was prior to his termination?
“[Defense counsel]: Yes, sir.
“THE COURT: .And there is going to be some evidence that there was some conversation about that incident between the defendant and this arresting officer?
“[Defense counsel]: Yes, sir. Precisely. If I could proffer to the Court — just one moment.
“Here is the other thing, Your Honor, too, and we probably need to get into when I mentioned a motion to suppress, I had kind of forgotten what — the angle that we are taking. But she was stopped allegedly for a traffic offense ... that the officer should have actually given her a ticket and let her go on her way.
“That was not done. She was actually held. And our contention would be that the initial arrest was illegal as far as holding her for anything further than just signing the ticket and going along her way.
“The officer stopped her at the time and said something about, ‘And I am sorry about what happened to my brother Brandon, but I am not going to be *231 sorry about what happens to you.’ He got out of the car—
“THE COURT: What brought that up?
“[Defense counsel]: The officer brought it up off the — out of the blue. It’s our contention that that is the only thing — or that is the thing that connects this arrest with the Brandon Jackson incident — the sexual assault on Ms. Adams — and that it corroborates, in fact, that it is, in fact, a wrongful-type of prosecution or wrongful arrest and a revenge-type of case.
“Ms. Adams didn’t bring it up, Your Honor, the police officer did. She didn’t know he had any connection to Brandon—
“THE COURT: And she can testify to that?
“[Defense counsel]: Yes, sir. And would not have if he hadn’t opened the door and made the statement.
“[Prosecutor]: I do want to clear something up. The tape is involving Brandon Jackson and the defendant, not the arresting officer in this case.
“THE COURT: Oh, I understand.
“[Prosecutor]: Okay.
“[Defense counsel]: Your Honor, it’s our whole theory of the case that it goes to the integrity of the case and whether there was really probable cause.
“THE COURT: Were there any criminal charges out of the sexual assault or misconduct?
“[Defense counsel]: The statute has not run — obviously not run yet, but—
“[Prosecutor]: It was investigated and brought to the DA’s office, and there was no warrant issued for rape first degree.
“If we go into this and this is — and this is why the State has asked for a motion in limine, we are stepping on a slippery slope that takes us way out of bounds of the issue — issues before the Court. And those issues involve statements made by the defendant regarding her drug problem to the investigators.
“The reason for the initial call that night was that the defendant’s husband had suspected that she had pawned items from their home for drugs. We are going to get into a lot of areas that take us way out of bounds of this trial and these issues.
“Brandon Jackson, I would think, would want to come to court and to refute some of these issues that are being brought up. And I don’t — I can’t possibly see how the officer in this case could get on the stand and say that, yes, he planted some drugs to get back at Ms. Adams for an incident that occurred. I don’t foresee that happening.
“THE COURT: You don’t foresee that happening?
“[Prosecutor]: I don’t foresee the officer who made this case getting on the stand and saying that he planted these drugs. Therefore, just the very question being posed during trial would have a prejudicial effect beyond its value to this case.
“THE COURT: Well, I don’t intend on allowing the defendant to go into any details about the termination and the reason for the termination of Officer Jackson in this case. I will allow the defendant to ask the officer if he made a statement of the nature that you have proffered to the Court in regard to what the defendant would testify in regard to what happened on the date of the incident.
“[Prosecutor]: Could that be done pri- or to the beginning of the trial? If he says no, then it can’t be gone into during the State’s case in chief.
*232 “THE COURT: Well, I don’t want to go into it before trial, no. The scope of examination of this witness in that regard would be limited to what happened on that occasion and whether or not this particular witness had any knowledge about this matter and whether that had anything to do with his arrest. But we are not going to go into any details, especially in regard to a recording between Officer Jackson and the defendant at some distance past event.
“[Defense counsel]: Your Honor, for the record, in reply we would simply say that we feel like that the tape and the conversation with Brandon Jackson is kind of a continuing-type of thing that culminated at some point into the police targeting Ms. Adams or watching her or being more aware of her presence and her comings and going and culminated into this arrest. I understand the Court’s ruling, but for the record we would—
“THE COURT: You haven’t presented any evidence that would support that theory at this point, in my opinion.
“[Defense counsel]: Well, Your Hon- or, it ties up with the statement by Officer Graham, I think.
“THE COURT: I don’t want you go to into any details about the allegations of sexual misconduct.
“[Defense counsel]: What about the existence of some sex — the fact that that occurred and then an allegation that she made a complaint? Would that—
“THE COURT: Well, first you are going to have to establish some connection between the testifying witness and Officer Jackson. Until you do that, then I am not going to let you go into any of it.
“[Defense counsel]: Well, the mere fact that they work the same precinct, Your Honor.
“THE COURT: Well, there are a lot of police officers that work at that precinct.”
(R. 17-28, emphasis added.)
At trial, Officer Graham testified:
“[Defense counsel]: Now at what point did you all discuss Brandon Jackson?
“[Prosecutor]: Objection.
“THE COURT: I will sustain as to the form of the question. It assumes things not in evidence.
“[Defense counsel]: Do you know Brandon Jackson?
“[Officer Graham]: Do I know Brandon Jackson? Yes, ma’am, I do.
“[Defense counsel]: He is a fellow Birmingham police officer, is he not?
“[Officer Graham]: He is an ex-Birmingham police officer.
“[Defense counsel]: Thank you. And did you all work out of the same precinct?
“[Officer Graham]: Yes, ma’am, we did.
“[Defense counsel]: How long did you all work out of the same precinct?
“[Officer Graham]: I couldn’t tell you how long Brandon Jackson was with Birmingham.
“[Defense counsel]: How long did you work with him?
“[Officer Graham]: I can’t tell you exactly how long. I didn’t work exactly with him.
“[Defense counsel]: Did you ever go on calls with him?
“[Officer Graham]: No, ma’am.
. “[Defense counsel]: Did you ever meet him at shift change?
“[Officer Graham]: No, ma’am.
“[Defense counsel]: Did you ever meet him at roll call?
*233 “[Officer Graham]: No, ma’am. Only passing after roll call.
“[Defense counsel]: But you knew Brandon Jackson; correct?
“[Officer Graham]: Yes, ma’am.”
(R. 78-79.)
“[Defense counsel]: Let me go back. Let me rephrase the question. You told this deputy district attorney that at some point you took her out of the patrol car and had her stand on the sidewalk; is that correct?
“[Officer Graham]: Yes, ma’am.
“[Defense counsel]: And that’s after you had a discussion about Brandon Jackson. Is that not a fair statement?
“[Officer Graham]: That sounds about fair.
“[Defense counsel]: Okay. And you knew what had happened or the allegations about Brandon Jackson, did you not?
“[Officer Graham]: Correct.
“[Defense counsel]: And you knew Ms. Adams.
“[Officer Graham]: No, ma’am. Never saw her before in my life until that night.
“[Defense counsel]: Okay. Now, but you felt strong enough about whatever you knew, that you took her out of your own patrol car; is that correct?
“[Officer Graham]: Yes, ma’am.”
(R. 83-84.) Thus the record reveals that, regardless of whether Officer Graham knew Jackson socially or whether Officer Graham worked closely with Jackson, not only did Officer Graham work in the same precinct as Jackson, but also Officer Graham did indeed know about the allegations Adams had made against Jackson. Additionally, the defense maintained that, after Adams filed the report against Jackson, Jackson “and a couple of others” telephoned Adams. Adams offered the audiotape of the telephone call in support of her assertions that others in the precinct knew of the incident and of Adams’s report against Jackson and that members of that precinct were targeting her because of that report.
The trial court allowed Adams to testify in a very limited fashion about her conspiracy defense; No evidence was before the jury regarding the fact that Adams had filed a complaint against Jackson and that the Birmingham Police Department’s internal affairs division had begun an investigation into her complaint. With the jury having no idea who the “other policeman” was, Adams testified as follows:
“[Prosecutor]: You heard the officer testify earlier, didn’t you?
“[Adams]: Yes, I did.
“[Prosecutor]: Your story is completely different than his story, isn’t it?
“[Adams]: He lied. He set me up because of that other policeman got fired.
“[Prosecutor]: Ma’am.
“[Adams]: Yes.
“[Prosecutor]: Is there anything that Officer Graham said on that stand that was true?
“[Adams]: Yes. He said one — he said a couple of things. He said I looked at — calm and I was cooperative, very cooperative.
“[Prosecutor]: But as far as pulling you over—
“[Adams]: Uh-huh.
“[Prosecutor]: — that’s a lie.
“[Adams]: Well, from what he said, yes, that’s a total he. It’s a total lie and he knows it. And he knows it.
“[Prosecutor]: And as far as finding cocaine in your [sic] backseat, that’s a lie too.
“[Adams]: Yes. And he knows it.”
*234 (R. 207-09, emphasis added.) The trial court also allowed Adams to testify that when she was in the backseat of the patrol car, she “ ‘just proceeded to tell [Officer Graham] about the officer that got terminated from doing what he did to me’ ” (R. 174.); that, the night of the arrest, at a friend’s apartment, her friend had seen Officer Graham driving by and had asked, “Do you know ... that police officer?”; and that, when Adams was taken to the police station, other officers said to Officer Graham, “Ooh ... you caught that big fish.” (R. 169-70, 184.)
“ ‘The admissibility of evidence, which has been challenged as irrelevant and remote, is within the sound discretion of the trial judge. A trial judge’s decision to admit or exclude such evidence will not be overturned on the appeal absent an abuse of his discretion.’ Primm v. State, 473 So.2d 1149, 1157 (Ala.Cr.App. 1985).”
Harvey v. State, 579 So.2d 22, 26 (Ala.Crim.App.1990).
“The appellate courts of Alabama have sanctioned a liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case.” C. Gamble, McElroy’s Alabama Evidence, § 21.01(1) (5th ed.1996). “Evidence is relevant if it has ‘any tendency to throw light upon the matter in issue, even though such light may be weak and falls short of demonstration.’ ” Mitchell v. State, 473 So.2d 591, 594 (Ala.Crim.App.1985) (quoting McCain v. State, 46 Ala.App. 627, 247 So.2d 383 (1971); Austin v. State, 434 So.2d 289 (Ala.Crim.App.1983)). Nowhere is this liberal test of relevancy more important than in application to evidence offered by a defendant in his own defense.
“The right to testify on one’s own behalf at a criminal trial has sources in several provisions of the Constitution. It is one of the rights that ‘are essential to due process of law in a fair adversary process.’ Faretta v. California, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975). The necessary ingredients of the Fourteenth Amendment’s guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony:
“ ‘A person’s right to reasonable notice of a charge against him, and an opportunity to be heard in his defense — a right to his day in court — are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.’ (Emphasis added [in Rock].) In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948).
“See also Ferguson v. Georgia, [365 U.S. 570, 602, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961)] (Clark, J., concurring) (Fourteenth Amendment secures ‘right of a criminal defendant to choose between silence and testifying in Ms own behalf).
“The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call ‘witnesses in his favor,’ a right that is guaranteed in the criminal courts of the States by the Fourteenth Amendment. Washington v. Texas, 388 U.S. 14, 17-19, 87 S.Ct. 1920, 1922-1923, 18 L.Ed.2d 1019 (1967). Logically included in the accused’s right to call witnesses whose testimony is ‘material and favorable to his defense,’ United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982), is a right to testify himself, should he decide it is in his favor to do so. In fact, the most important witness for the defense in many *235 criminal cases is the defendant himself. There is no justification today for a rule that denies an accused the opportunity to offer his own testimony. Like the truthfulness of other witnesses, the defendant’s veracity, which was the concern behind the original common-law rule, can be tested adequately by cross-examination. See generally Westen, The Compulsory Process Clause, 73 Mich. L.Rev. 71,119-120 (1974).
“Moreover, in Faretta v. California, 422 U.S., at 819, 95 S.Ct., at 2533, the Court recognized that the Sixth Amendment
“ ‘grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be “informed of the nature and cause of the accusation,” who must be “confronted with the witnesses against him,” and who must be accorded “compulsory process for obtaining witnesses in his favor.” ’ (Emphasis added [in Rock].)
“Even more fundamental to a personal defense than the right of self-representation, which was found to be ‘necessarily implied by the structure of the Amendment,’ ibid., is an accused’s right to present his own version of events in his own words. A defendant’s opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.
[[Image here]]
“Just as a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand, it also may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily exclude material portions of his testimony....
“Of course, the right to present relevant testimony is not without limitation. The right ‘may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.’ [Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).]”
Rock v. Arkansas, 483 U.S. 44, 51-52, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (footnotes omitted).
Certainly a trial court is allowed to limit the admission of relevant evidence during trial if the evidence’s “probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Rule 403, Ala. R. Evid. See also Spellman v. State, 473 So.2d 618, 621 (Ala.Crim.App.1985). However, in this case, Adams offered proof that her allegations were more than “mere conjecture or remote inferences”; she offered the police report she filed against Jackson; the audiotape of the telephone call in which Jackson and other officers threatened her shortly after she had filed her report against Jackson; and the letter she received from internal affairs informing her that an investigation into her allegations against Jackson had been launched. Hawkins v. State, 549 So.2d 552, 557 (Ala.Crim.App.1989). Additionally, the evidence that Officer Graham knew Jackson, or at least knew of the investigation surrounding Jackson, was sufficient to bolster Adams’s defense theory of a conspiracy. The trial court nonetheless limited Adams’s ability to defend herself based upon the State’s assertion that any evidence of the alleged rape and Adams’s subsequent report to the police department would involve “areas that take us way out of bounds of this trial and these issues,” particularly “statements made by the defendant regarding her drug problem to the investigators.” The theory of Adams’s defense was certainly within *236 the bounds of her trial, and the defendant, not the State, would have been prejudiced by any evidence indicating she had a drug problem.
Although any details regarding the rape itself may have been overly prejudicial or irrelevant or may have resulted in a “trial within a trial,” Adams’s right to be heard in her own defense required that the trial court admit the evidence indicating that she had filed a complaint against Jackson alleging that he had raped her, that Internal Affairs had launched ah investigation of Officer Jackson based upon that report, and that Officer Graham knew of this investigation and any disciplinary action involving Jackson because he worked in the same precinct. As the record stands, Adams was allowed to introduce evidence indicating that Officér Graham had knowledge of allegations against a fellow officer, without being able to verify and to define what those allegations were, thus leaving the jury with only part of the story. The problem here lies in the fact that, because Adams’s testimony only alluded to a conspiracy, her credibility was damaged because she was allowed to testify only to vague and unfounded fears, which, it is clear from the record, made her appear less credible.
For the reasons stated above, we conclude that the trial court abused its discretion in granting the State’s motion in limine regarding Adams’s evidence indicating a police bias against her and that Adams was substantially prejudiced as a result thereof. The judgment is therefore reversed and the cause remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, P.J., and SHAW, J., concur.
BASCHAB, J., dissents, with opinion, joined by WISE, J.